**<u>EXHIBIT 42</u>**

**(Craryville Solar 2 Pledge Agreement)**

C#: 581050141



# Pledge Agreement

This PLEDGE AGREEMENT (as the same may from time to time be amended, restated or otherwise modified, this "Agreement") is made effective as of February 17, 2017, by **MONOLITH SOLAR ASSOCIATES LLC**, a New York limited liability company ("Pledgor"), in favor of **KEY EQUIPMENT FINANCE, A DIVISION OF KEYBANK NATIONAL ASSOCIATION** ("KEF").

   1.   Recitals.

**Craryville Two Town Road Solar 2 LLC**, a New York limited liability company (together with its successors and assigns, "Lessee"), is entering into that certain Master Equipment Lease Agreement, dated as of even date herewith, with KEF (as the same may from time to time be amended, restated or otherwise modified, and together with any Equipment Schedules or other documents related thereto, the "Lease Agreement"). Pledgor desires that KEF grant to Lessee the financial accommodations as described in the Lease Agreement.

Pledgor, the owner of all of the equity interests of Lessee, deems it to be in the direct pecuniary and business interests of Pledgor that Lessee obtain from KEF the financial accommodations provided for in the Lease Agreement.

Pledgor understands that KEF is willing to enter into the Lease Agreement and grant the financial accommodations provided for in the Lease Agreement only upon certain terms and conditions, one of which is that Pledgor grant to KEF a security interest in the Collateral, as hereinafter defined, and this Agreement is being executed and delivered in consideration of KEF entering into the Lease Agreement and each financial accommodation granted to Lessee by KEF, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged.

   2.   Definitions. Except as specifically defined herein, (a) capitalized terms used herein that are defined in the Lease Agreement shall have their respective meanings ascribed to them in the Lease Agreement, and (b) unless otherwise defined in the Lease Agreement, terms that are defined in the U.C.C. are used herein as so defined. As used in this Agreement, the following terms shall have the following meanings:

"Collateral" means, collectively, (a) the Pledged Securities and each addition, if any, thereto and each substitution, if any, therefor, in whole or in part, (b) the certificates representing the Pledged Securities, if any, and (c) the dividends, cash, instruments and other property distributed in respect of and other proceeds of any of the foregoing.

"Event of Default" means an event or condition that constitutes an Event of Default, as defined in Section 6.1 hereof.

"Lease Documents" means, with respect to each lease transaction, collectively, this Agreement, a Lease Agreement, an Equipment Schedule, a Certificate of Acceptance, a Continuing Security Agreement and a Collateral Schedule and all other documents prepared by KEF and now or hereafter executed in connection therewith.

"Person" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental instrumentality or political subdivision thereof, any other regulatory or administrative agency, any court of competent jurisdiction, or any other entity.

"Pledged Securities" means all of the shares of capital stock or other equity interest of Lessee, whether now owned or hereafter acquired or created, and all proceeds thereof. As of the date hereof, the existing Pledged Securities are listed on the attached Exhibit A.

"Secured Obligations" means all of the following obligations of Lessee, whether direct or indirect, absolute or contingent, matured or unmatured, originally contracted with KEF or another party, and now or hereafter owing to or acquired in any manner partially or totally by KEF or in which KEF may have acquired a participation, contracted by Lessee alone or jointly or severally: (a) Lessee's obligations under the Lease Agreement and the other Lease Documents, (b) any and all indebtedness, obligations, liabilities, contracts, indentures, agreements, warranties, covenants, guaranties, representations, provisions, terms, and conditions of whatever kind, now existing or hereafter arising, and however evidenced, that are now or hereafter owed, incurred or executed by Lessee to, in favor of, or with KEF, and including any partial or total extension, restatement, renewal, amendment, and substitution thereof or therefor; (c) any and all claims of whatever kind of KEF against Lessee, now existing or hereafter arising; and (d) any and all of KEF's fees, costs and expenses related to the foregoing.

   3.   Grant of Security Interest. In consideration of and as security for the full and complete payment of all of the Secured Obligations, Pledgor hereby agrees that KEF shall at all times have, and hereby grants to KEF, a security

interest in all of the Collateral. For the better protection of KEF hereunder, Pledgor has executed appropriate transfer powers, in the form of the attached Exhibit B, with respect to the Pledged Securities and, concurrently herewith, is depositing the Pledged Securities and the aforesaid transfer powers with KEF. Pledgor authorizes KEF, at any time after the occurrence of an Event of Default, to transfer the Pledged Securities into the name of KEF or KEF's nominee, but KEF shall be under no duty to do so. Notwithstanding any provision or inference herein or elsewhere to the contrary, KEF shall have no right to vote the Pledged Securities at any time unless and until an Event of Default shall have occurred and be continuing.

4.    Representations and Warranties. Pledgor hereby represents and warrants to KEF as follows:

4.1.   Pledgor is the legal record and beneficial owner of, and has good and marketable title to, the Pledged Securities, and the Pledged Securities are not subject to any pledge, lien, mortgage, hypothecation, security interest, charge, option, warrant or other encumbrance whatsoever, nor to any agreement purporting to grant to any third party a security interest in the property or assets of Pledgor that would include such Pledged Securities, except the security interest created by this Agreement or otherwise securing only KEF.

4.2.   All of the Pledged Securities have been duly authorized and validly issued, and are fully paid and non-assessable.

4.3.   Pledgor has full power, authority and legal right to pledge all of the Pledged Securities pursuant to the terms of this Agreement.

4.4.   No consent, license, permit, approval or authorization, filing or declaration with any governmental authority, and no consent of any other Person, is required to be obtained by Pledgor in connection with the pledge of the Pledged Securities hereunder, that has not been obtained or made, and is not in full force and effect.

4.5.   The pledge, assignment and delivery of the Pledged Securities hereunder creates a valid first lien on, and a first perfected security interest in, the Pledged Securities and the proceeds thereof. Other than pursuant to this Agreement, Pledgor has not granted any other liens on, or security interests in, the Pledged Securities.

4.6.   The Pledged Securities constitute one hundred percent (100%) of the outstanding equity interests owned by Pledgor of Lessee.

4.7.   Pledgor fully anticipates that the Secured Obligations will be repaid without the necessity of selling the Pledged Securities.

4.8.   Pledgor has received consideration that is the reasonably equivalent value of the obligations and liabilities that Pledgor has incurred to KEF. Pledgor is not insolvent, as defined in any applicable state or federal statute, nor will Pledgor be rendered insolvent by the execution and delivery of this Agreement to KEF or any other documents executed and delivered to KEF in connection herewith. Pledgor is not engaged or about to engage in any business or transaction for which the assets retained by Pledgor are or will be an unreasonably small amount of capital, taking into consideration the obligations to KEF incurred hereunder. Pledgor does not intend to, nor does it believe that it will, incur debts beyond Pledgor's ability to pay such debts as they mature.

4.9.   If the Pledged Securities are "restricted securities" within the meaning of Rule 144, or any amendment thereof, promulgated under the Securities Act of 1933, as amended (the "Securities Act"), as determined by counsel for Pledgor, Pledgor further represents and warrants that (a) Pledgor has been the beneficial owner of the Pledged Securities for a period of at least one year prior to the date hereof, (b) the full purchase price or other consideration for the Pledged Securities has been paid or given at least one year prior to the date hereof, and (c) Pledgor does not have a short position in or any put or other option to dispose of any securities of the same class as the Pledged Securities or any other securities convertible into securities of such class.

5.    Additional Covenants of Pledgor.

5.1.   Pledgor covenants and agrees to defend the right, title and security interest of KEF in and to the Pledged Securities and the proceeds thereof, and to maintain and preserve the lien and security interest provided for by this Agreement against the claim and demands of all Persons, so long as this Agreement shall remain in effect.

5.2.   Pledgor covenants and agrees not to sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, or create, incur or permit to exist any pledge, lien, mortgage, hypothecation, security interest, charge, option or any other encumbrance with respect to any of the Pledged Securities, or any interest therein, or any proceeds thereof, except for the lien and security interest provided for by this Agreement and any security agreement securing only KEF.

5.3.   Pledgor covenants and agrees (a) to cooperate, in good faith, with KEF and to do or cause to be done all such other acts as may be necessary to enforce the rights of KEF under this Agreement, (b) not to take any action, or to fail to take any action that would be adverse to the interest of KEF in the Collateral and hereunder, and (c) to make any sale or sales of any portion or all of the Pledged Securities valid and binding and in compliance with any and all applicable laws,

regulations, orders, writs, injunctions, decrees or awards of any and all courts, arbitrators or governmental instrumentalities, domestic or foreign, having jurisdiction over any such sale or sales at Pledgor's expense.

5.4.    Pledgor covenants and agrees that, promptly upon request by KEF (which request may be made at any time, irrespective of an Event of Default and at the sole discretion of KEF), Pledgor shall, as the sole member of Lessee, cause the Operating Agreement (or other similar document) of Lessee to be amended so that the membership interests in Lessee constitute a "security" as governed by Article 8 of the U.C.C., and that any certificate evidencing such interests is a "certificated security" within the meaning of Section 8-102(a)(4) of the U.C.C., with such amendment documentation to be in form and substance satisfactory to KEF.

6.    Events of Default and Remedies.

6.1.    Any of the following shall constitute an "Event of Default" under this Agreement: (a) a Default, as defined in the Lease Agreement, shall occur under the Lease Agreement; (b) any representation, warranty or statement made by Pledgor in or pursuant to this Agreement or in any other writing received by KEF in connection with the Secured Obligations shall be false or erroneous in any material respect; or (c) Pledgor shall fail or omit to perform or observe any agreement made by Pledgor in or pursuant to this Agreement or in any other writing received by KEF pursuant hereto.

6.2.    KEF shall at all times have the rights and remedies of a secured party under the U.C.C. as in effect from time to time, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, any Lease Document, or otherwise provided in law or equity.

6.3.    Upon the occurrence of an Event of Default hereunder, KEF, in its discretion, may sell, assign, transfer and deliver any of the Collateral, at any time, or from time to time. No prior notice need be given to Pledgor or to any other Person in the case of any sale of Collateral that KEF determines to be declining speedily in value or that is customarily sold in any securities exchange, over-the-counter market or other recognized market, but in any other case KEF shall give Pledgor no fewer than ten days prior notice of either the time and place of any public sale of the Collateral or of the time after which any private sale or other intended disposition thereof is to be made. Pledgor waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, KEF may purchase the Collateral, or any part thereof, free from any right of redemption, all of which rights Pledgor hereby waives and releases. After deducting all of KEF's fees, costs and expenses related to the foregoing, and after paying all claims, if any, secured by liens having precedence over this Agreement, KEF may apply the net proceeds of each such sale to or toward the payment of the Secured Obligations, whether or not then due, in such order and by such division as KEF in its sole discretion may deem advisable. Any excess, to the extent permitted by law, shall be paid to Pledgor, and the obligors on the Secured Obligations shall remain liable for any deficiency. In addition, KEF shall at all times have the right to obtain new appraisals of Pledgor or the Collateral, the cost of which shall be paid by Pledgor.

7.    Power of Attorney. Pledgor hereby authorizes and empowers KEF to make, constitute and appoint any officer or agent of KEF as KEF may select, in its exclusive discretion, as Pledgor's true and lawful attorney-in-fact, with the power to endorse Pledgor's name on all applications, documents, papers and instruments necessary for KEF to take actions with respect to the Collateral after the occurrence of an Event of Default, including, without limitation, actions necessary for KEF to assign, pledge, convey or otherwise transfer title in or dispose of the Collateral to any Person or Persons. Pledgor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney shall be irrevocable for the life of this Agreement.

8.    Costs and Expenses. If Pledgor fails to comply with any of its obligations hereunder, KEF may do so in the name of Pledgor or KEF, but at Pledgor's expense, and Pledgor hereby agrees to reimburse KEF in full for all expenses, including attorneys' fees, incurred by KEF in protecting, defending and maintaining the Collateral. Without limiting the foregoing, any and all fees, costs and expenses, of whatever kind or nature, including the attorneys' fees and expenses incurred in connection with the filing or recording of any documents (including all taxes in connection therewith) in public offices, the payment or discharge of any taxes, maintenance fees, encumbrances or otherwise protecting, maintaining or preserving the Collateral, or in defending or prosecuting any actions or proceedings arising out of or related to the Collateral, shall be borne and paid by Pledgor upon request of KEF.

9.    Notice. All notices, requests, demands and other communications provided for hereunder shall be in writing and, if to Pledgor, mailed or delivered to it, addressed to it at the address specified on the signature page of this Agreement, if to KEF, mailed or delivered to it, addressed to 1000 S. McCaslin Boulevard, Superior, Colorado 80027, or, as to each party, at such other address as shall be designated by such party in a written notice to each of the other parties. All notices, statements, requests, demands and other communications provided for hereunder shall be deemed to be given or made when delivered (if received during normal business hours on a business day, such business day, or otherwise the following business day) or two business days after being deposited in the mails with postage prepaid by registered or certified mail, addressed as aforesaid, or sent by facsimile or electronic communication, in each case of facsimile or electronic communication, with telephonic confirmation of receipt. All notices from Pledgor to KEF pursuant to any of the provisions hereof shall not be effective until received by KEF.

    10.    No Waiver or Course of Dealing. No course of dealing between Pledgor and KEF, nor any failure to exercise, nor any delay in exercising, on the part of KEF, any right, power or privilege hereunder or under any of the Lease Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

    11.    Remedies Cumulative. Each right, power or privilege specified or referred to in this Agreement is in addition to any other rights, powers and privileges that KEF may have or acquire by operation of law, by other contract or otherwise. Each right, power or privilege may be exercised by KEF either independently or concurrently with other rights, powers and privileges and as often and in such order as KEF may deem expedient. All of the rights and remedies of KEF with respect to the Collateral, whether established hereby or by the Lease Documents, or by any other agreements or by law shall be cumulative and may be executed singularly or concurrently.

    12.    Severability. The provisions of this Agreement are severable, and, if any clause or provision shall be held invalid and unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction, and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Agreement in any jurisdiction.

    13.    Modifications. This Agreement may be amended or modified only by a writing signed by Pledgor and KEF. No waiver or consent granted by KEF in respect of this Agreement shall be binding upon KEF unless specifically granted in writing, which writing shall be strictly construed.

    14.    Assignment and Successors. This Agreement shall not be assigned by Pledgor without the prior written consent of KEF. This Agreement shall be binding upon Pledgor and the successors and permitted assigns of Pledgor, and shall inure to the benefit of and be enforceable and exercisable by KEF and its successors and assigns. Any attempted assignment or transfer without the prior written consent of KEF shall be null and void.

    15.    Entire Agreement. This Agreement integrates all of the terms and conditions with respect to the Collateral and supersedes all oral representations and negotiations and prior writings, if any, with respect to the subject matter hereof.

    16.    Headings; Execution. The headings and subheadings used herein are for convenience of reference only and shall be ignored in interpreting the provisions of this Agreement. This Agreement may be executed by facsimile signature, which, when so executed and delivered, shall be deemed to be an original.

    17.    Governing Law; Submission to Jurisdiction. The provisions of this Agreement and the respective rights and duties of Pledgor and KEF hereunder shall be governed by and construed in accordance New York law that would result in the application of the law of any other state. Pledgor hereby irrevocably submits to the non-exclusive jurisdiction of any New York state or federal court sitting in New York County, New York, over any action or proceeding arising out of or relating to this Agreement, any Lease Document, and Pledgor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York state or federal court. Pledgor hereby irrevocably waives, to the fullest extent permitted by law, any objection it may now or hereafter have to the laying of venue in any such action or proceeding in any such court as well as any right it may now or hereafter have to remove such action or proceeding, once commenced, to another court on the grounds of FORUM NON CONVENIENS or otherwise. Pledgor agrees that a final, nonappealable judgment in any such action or proceeding in any state or federal court in the State of New York shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

    JURY TRIAL WAIVER. PLEDGOR AND KEF, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AMONG PLEDGOR, LESSEE AND KEF, OR ANY THEREOF, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT OR ANY LEASE DOCUMENT OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

**(Signature Page follows)**

IN WITNESS WHEREOF, the undersigned has executed and delivered this Pledge Agreement as of the date first set forth above.

Address:

     444 Washington Street

     Rensselaer, NY 12144

**Monolith Solar Associates LLC**

By:

Name: Mark Fobare

Title: CEO

**Consent of Manager of Craryville Two Town Road Solar 2 LLC**

By:

Name: Mark Fobare

Title: Manager

EXHIBIT A

PLEDGED SECURITIES

| Name of Company | Jurisdiction of Company | Number of Membership Units | Certificate Number | Ownership Percentage |
|---|---|---|---|---|
| Craryville Two Town Road Solar 2 LLC | New York | N/A | N/A | 100% |

EXHIBIT B

FORM OF UNIT TRANSFER POWER

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers unto

(_____)   units   of   membership   interests   of

_____ standing in _____ name on the books of said corporation

and represented by Certificate No. _____ herewith and does hereby irrevocably constitute and appoint

_____ attorney to transfer the said units on the books of the within named corporation with

full power of substitution in the premises.

**MONOLITH SOLAR ASSOCIATES LLC**

Date: _____

By: _____

Name: Mark Fobare

Title: CEO _____

# EXHIBIT 43

**(March 16, 2017 Albany Lease Agreement)**

Cit: 581050464

## Master Equipment Lease Agreement

**THIS MASTER EQUIPMENT LEASE AGREEMENT** dated as of March 16, 2017 ("Master Lease") is made by and between **KEY EQUIPMENT FINANCE, A DIVISION OF KEYBANK NATIONAL ASSOCIATION**, having an address at 1000 S. McCaslin Blvd., Superior, CO 80027 ("Lessor"), and **ALBANY CSD SOLAR 1 LLC** with its chief executive offices located at 444 Washington Street, Rensselaer, NY 12144 ("Lessee").

**1.      Lease.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, Equipment, subject to and upon the terms set forth herein and in any equipment schedule executed in connection herewith (each, a "Schedule"). Each Schedule shall constitute a separate and enforceable lease incorporating all the terms of this Master Lease (each Schedule, together with this Master Lease as it relates to such Schedule, is referred to herein as a "Lease"). If any term of a Schedule conflicts or is inconsistent with any term of this Master Lease, the terms of such Schedule shall govern.

**2.      Definitions.** Unless the context otherwise requires, as used in the Lease, the following terms shall have the respective meanings indicated below and shall be equally applicable to both the singular and the plural forms thereof:

"Code" means the Internal Revenue Code of 1986, as amended.

"Equipment" means each item of property designated on a Schedule that will be leased by Lessee pursuant to the Lease, together with all replacement parts, additions and accessories incorporated therein or affixed thereto. Where rights to receive license fees for Software and charges for Services supplied or to be supplied to Lessee are included in the amount financed by Lessor under the Lease, references to leasing, purchases, ownership and administration of "Equipment" under the Lease shall be broadly interpreted to include such Financed Fees.

"Fair Market Rental Value" or "Fair Market Sale Value" means the value of Equipment for lease or sale, in place and in continued use, which would be obtained in an arm's length transaction between an informed and willing retail lessor or seller (under no compulsion to lease or sell) and an informed and willing retail lessee or buyer (under no compulsion to lease or purchase), assuming that Equipment is in the condition specified by Sections 10 and 11 hereof, as determined by the parties or, if the parties cannot agree, by an American Society of Appraisers certified appraiser selected by Lessor and paid for by Lessee.

"Financed Fees" means the Software license, usage, or other fees and the charges for Services, if any, specified on a Schedule.

"Guarantor" means any guarantor of Lessee's obligations hereunder, including (without limitation) Monolith Solar Associates LLC, a New York limited liability company.

"Initial Term Expiration Date" shall have the meaning specified in the applicable Schedule.

"Lease Documents" means this Master Lease, a Schedule and all other documents relating to or provided in connection with a Lease, prepared by Lessor, and now or hereafter executed in connection herewith or therewith, as the same may be modified, amended, extended or replaced.

"License Agreement" means the software license agreement(s) between Lessee and Licensor relating to Software.

"Licensor" means the Supplier(s) of Software, solely in its (their) capacity as licensor of such Software.

"Purchase Agreement" means any purchase agreement or other contract between a Supplier and Lessee for the acquisition of Equipment to be leased or financed under a Lease.

"Rent" means the periodic payments due for the leasing of Equipment as set forth on the related Schedule and, where the context hereof requires, all such additional amounts as may, from time to time, be payable under a Lease. The term "Rent" shall include interim rent, if any, as described in Section 5 hereof.

"Rent Commencement Date" means, with respect to Equipment, the date on which (a) Lessor receives an executed Certificate of Acceptance for Equipment from Lessee or (b) Lessor disburses funds for the purchase of Equipment, as determined by Lessor in its sole discretion.

"Rent Payment Date" shall have the meaning specified in the applicable Schedule.

"Section" means, unless the context provides otherwise, Sections of the Code.

"Services" means all training, installation, transportation, handling, maintenance, custom programming, integration, technical

consulting and support services relating to Equipment and specified on a Schedule.

"Software" means the software and all related documentation, corrections, updates and revisions used in connection with Equipment financed under a Schedule.

"Stipulated Loss Value" shall have the meaning specified in the applicable Schedule.

"Supplier" means the manufacturer or the vendor of the Equipment.

"Term" means the Initial Term or any Renewal Term, each as defined in Section 6 hereof, and any Extended Lease Term or Interim Term, as defined in the applicable Schedule.

**3.** **Ordering Equipment.** Lessee hereby assigns to Lessor all of Lessee's rights, but none of its obligations, under any Purchase Agreement related to a Lease. Lessor may (a) accept such assignment from Lessee of Lessee's rights, but none of Lessee's obligations, under any such Purchase Agreement and/or (b) issue a purchase order for the Equipment to the Supplier. Lessee shall arrange for delivery of Equipment. If Equipment is subject to an existing Purchase Agreement between Lessee and the Supplier, and Equipment has been delivered to Lessee as of the date of the Schedule applicable thereto, Lessee warrants that it has advised Lessor of the delivery date(s) of such Equipment. Lessee hereby authorizes Lessor to complete each Schedule with the serial numbers and other identification data of Equipment associated therewith as such data is received by Lessor.

**4.** **Delivery and Acceptance.** Upon delivery to and acceptance by Lessee of any Equipment, Lessee shall execute and deliver to Lessor a Certificate of Acceptance in form acceptable to Lessor ("Certificate of Acceptance"). **LESSOR SHALL HAVE NO OBLIGATION TO ADVANCE ANY FUNDS HEREUNDER UNLESS AND UNTIL LESSOR RECEIVES A CERTIFICATE OF ACCEPTANCE FOR SUCH EQUIPMENT EXECUTED BY LESSEE.**

**5.** **Rent; Delinquent Payments.** (a) Lessee shall pay Rent commencing on the Rent Commencement Date, and, unless otherwise set forth on the applicable Schedule, on the same day of each payment period thereafter for the balance of the Term. Rent shall be due whether or not Lessee has received any notice that it is due, and all Rent shall be paid to Lessor at its address set forth on the Schedule, or as otherwise directed by Lessor in writing.

(b) If Lessee fails to pay any Rent or other sums under the Lease on or before the date when the same becomes due, Lessee shall pay to Lessor (in addition to and not in lieu of other rights of Lessor) a late charge equal to the lesser of five percent of such delinquent amount or the maximum permitted by law. Such late charge shall be payable by Lessee upon demand by Lessor and shall be deemed Rent hereunder. Lessee acknowledges and agrees that the late charge (i) does not constitute interest, (ii) is an estimate of the costs Lessor will incur as a result of the late payment and (iii) is reasonable in amount. Without contravening any claim of title or true lease, Lessor does not intend to charge any amount in excess of the maximum amount of time price differential or interest, as applicable, permitted to be charged or collected by applicable law and any such excess amounts will be applied to payments due under the Lease, in inverse order of maturity, with any surplus refunded to Lessee.

**6.** **Term; Survival.** With respect to any Equipment, unless otherwise specified on a Schedule, the initial term of the Lease (the "Initial Term") shall commence on the earlier of (a) the date risk of loss is transferred from the Supplier to Lessee or Lessor or (b) the date on which such Equipment is delivered to Lessee and, unless earlier terminated as provided herein, shall expire on the Initial Term Expiration Date. Any renewal term of the Lease (individually, a "Renewal Term") shall commence immediately upon the expiration of the Initial Term or any prior Renewal Term, as the case may be, and, unless earlier terminated as provided herein, shall expire on the last day of the period for which the final payment of Rent is due. All obligations of Lessee hereunder shall survive the expiration, cancellation or other termination of the Term of each Lease.

**7.** **Location; Inspection; Labels.** Equipment shall be delivered to the location specified in the Schedule and shall not be removed therefrom without Lessor's prior written consent. Lessor shall have the right to enter upon the premises where the Equipment is located and inspect the Equipment at any reasonable time.

**8.** **Non-Cancelable Lease.** THE LEASE IS A NET LEASE. LESSEE'S OBLIGATION TO PAY RENT AND PERFORM ITS OBLIGATIONS HEREUNDER ARE ABSOLUTE, IRREVOCABLE AND UNCONDITIONAL AND SHALL NOT BE SUBJECT TO ANY RIGHT OF SET OFF, COUNTERCLAIM, DEDUCTION, DEFENSE OR OTHER RIGHT LESSEE MAY HAVE AGAINST THE SUPPLIER, LESSOR OR ANY OTHER PARTY PROVIDED, HOWEVER, THAT NOTHING HEREIN SHALL PRECLUDE LESSEE FROM ASSERTING ANY SUCH CLAIMS IN A SEPARATE CAUSE OF ACTION. LESSEE UNDERSTANDS AND AGREES THAT NEITHER THE SUPPLIER NOR ANY SALES REPRESENTATIVE OR OTHER AGENT OF THE SUPPLIER IS AN AGENT OF LESSOR OR IS AUTHORIZED TO WAIVE OR ALTER ANY TERM OR CONDITION OF THE LEASE, AND NO SUCH WAIVER OR ALTERATION SHALL VARY THE TERMS OF THE LEASE. LESSOR IS NEITHER A SUPPLIER NOR A LICENSOR, AND LESSOR IS NOT RESPONSIBLE FOR REPAIRS, SERVICE OR DEFECTS IN EQUIPMENT. LESSEE AGREES NOT TO ASSERT AGAINST LESSOR ANY CLAIMS OR DEFENSES LESSEE MAY HAVE WITH RESPECT TO EQUIPMENT, AND UNDERSTANDS THAT IT MAY ASSERT SUCH CLAIMS AGAINST SUPPLIER OR LICENSOR.

**9.** **Use; Alterations.** (a) Lessee shall use Equipment lawfully and only in the manner for which it was designed and intended and so as to subject it only to ordinary wear and tear. Lessee shall comply with all applicable laws. Lessee shall

immediately notify Lessor, in writing, upon becoming aware of any existing or threatened investigation, claim or action by any governmental authority that could adversely affect Equipment, Lessor or the Lease. Lessee, at its own expense, shall make such alterations, additions or modifications (each, a "Required Alteration") to Equipment as may be required from time to time to meet the requirements of applicable law or a governmental body. All such Required Alterations shall immediately, and without further act, be deemed to constitute "Equipment" and be fully subject to the Lease as if originally leased hereunder. Except as otherwise permitted herein, Lessee shall not make any alterations to Equipment without Lessor's prior written consent.

(b) Lessee, at its own expense, may from time to time add or install upgrades or attachments (each an "Upgrade") to Equipment during the Term; provided, that such Upgrades (i) are readily removable without causing material damage to Equipment, (ii) do not materially adversely affect the Fair Market Sale Value, the Fair Market Rental Value, residual value, productive capacity, utility or remaining useful life of Equipment and (iii) do not cause Equipment to become "limited use property" within the meaning of Revenue Procedure 2001-28, 2001-19 I.R.B. 1156 (or such other successor tax provision), as of the date of installation of such Upgrade. Any such Upgrades shall remain the property of Lessee. Upon the expiration or earlier cancellation of the Lease, Lessee may, at its option, remove any such Upgrades and, upon such removal, shall restore Equipment to the condition required hereunder.

(c) If any Equipment covered under any Lease becomes attached or affixed to, or used in connection with, Equipment covered under another Lease hereunder (a "Related Lease"), Lessee agrees that, if Lessee elects to exercise a purchase or renewal option under any such Lease, or if Lessee elects to return Equipment under any such Lease, then Lessor, in its sole discretion, may require that all Equipment leased under all Related Leases be similarly disposed of.

**10.    Repairs and Maintenance.** Lessee, at Lessee's cost and expense, shall (a) keep Equipment in good repair, good operating condition, appearance and working order in compliance with the manufacturer's recommendations and Lessee's standard practices (but in no event less than industry practices), (b) take all actions necessary to ensure that the Equipment will be eligible, at the expiration of the Initial Term and any Renewal Term, for a standard, full service maintenance contract with the manufacturer, (c) properly service all components of Equipment following the manufacturer's written operating and servicing procedures, (d) enter into and keep in full force and effect during the Term a maintenance agreement covering the Equipment with the manufacturer, or a manufacturer-approved maintenance organization, to maintain, service and repair such Equipment, as otherwise required herein (but an alternate source of maintenance may be used by Lessee with Lessor's prior written consent), (e) upon Lessor's request furnish Lessor with an executed copy of any such maintenance agreement, and (f) replace any part of the Equipment that becomes unfit or unavailable for use from any cause (whether or not such replacement is covered by a maintenance agreement) with a replacement part that, in Lessor's sole opinion, is of the same manufacture, value, remaining useful life and utility as the replaced part immediately preceding the replacement, assuming that such replaced part was in the condition required by this Lease. Replacement parts shall be free and clear of all liens, constitute Equipment and be fully subject to this Lease as if originally leased hereunder.

**11.    Return of Equipment.** Except as otherwise provided in a Schedule, upon the expiration or earlier termination or cancellation of each Lease, Lessee, at its sole expense, shall de-install, assemble, pack properly and in accordance with the manufacturer's instructions (under the supervision of persons acceptable to Lessor), including labeling of all components and hardware, and return to Lessor all, but not less than all, Equipment by delivering the Equipment to and unloading it at such location or with such carrier as Lessor shall specify within the continental United States. Lessee agrees that (a) Equipment, when returned, shall be in the condition required by the Lease, and (b) upon Lessor's request, Lessee will obtain from the manufacturer (or other maintenance service provider previously approved by Lessor or manufacturer) a certificate stating that such Equipment qualifies for full maintenance service at the standard rates and terms then in effect. If, in the reasonable opinion of Lessor, any Equipment fails to meet the standards set forth above, Lessee agrees to pay, on demand, all costs and expenses incurred in connection with the repairing and restoring of such Equipment so as to meet such standards. If Lessee fails to return any Equipment as required hereunder, then all of Lessee's obligations under the Lease (including, without limitation, Lessee's obligation to pay Rent for the Equipment at the rental then applicable under the Lease) shall continue in full force and effect until such Equipment shall have been returned in the condition required under the Lease.

**12.    Sublease and Assignment.** (a) **LESSEE SHALL NOT, WITHOUT LESSOR'S PRIOR WRITTEN CONSENT, (i) SELL, ASSIGN, TRANSFER, PLEDGE, HYPOTHECATE OR OTHERWISE DISPOSE OF THE LEASE, EQUIPMENT OR ANY INTEREST THEREIN, (ii) RENT, SUBLET OR LEND EQUIPMENT TO ANYONE OR (iii) PERMIT EQUIPMENT TO BE USED BY ANYONE OTHER THAN LESSEE OR LESSEE'S AFFILIATES AND THEIR RESPECTIVE QUALIFIED EMPLOYEES. LESSEE ACKNOWLEDGES THAT IT REMAINS PRIMARILY LIABLE FOR ALL OBLIGATIONS HEREUNDER NOTWITHSTANDING ANY USE BY AN AFFILIATE.**

(b) Lessor, at any time with notice to Lessee, may sell, transfer, assign and/or grant a security interest in all or any part of Lessor's interest in each Lease or any Equipment (each, a "Lessor Transfer"). Any purchaser, transferee, assignee or secured party of Lessor (each a "Lessor Assignee") shall have and may exercise all of Lessor's rights hereunder with respect to the items to which any such Lessor Transfer relates, and Lessee shall not assert against any Lessor Assignee any claim that Lessee may have against Lessor provided, Lessee may assert any such claim in a separate action against Lessor. Upon written notice of a Lessor Transfer, Lessee shall promptly acknowledge in writing its obligations under the applicable Lease, shall comply with the written directions or demands of any Lessor Assignee and shall make all payments due under the applicable Schedule as directed in writing by the Lessor Assignee. Following such Lessor Transfer, the term "Lessor" shall be deemed to include or refer to each Lessor Assignee. Lessee will provide reasonable assistance to Lessor to complete any

transaction contemplated by this subsection (b).

(c) Subject to the restriction on assignment contained in subsection (a), the Lease Documents shall inure to the benefit of, and are binding upon, the successors and assigns of the parties thereto including, without limitation, each person who becomes bound thereto as a "new debtor" as set forth in the Uniform Commercial Code ("UCC").

**13.     Risk of Loss; Damage to Equipment.** (a) Lessee shall bear the entire risk of loss (including without limitation, theft, destruction, disappearance of or damage to Equipment from any cause whatsoever), whether or not insured against, during the Term of each Lease and until Equipment is returned to Lessor in accordance with Section 11 hereof. No such loss shall relieve Lessee of the obligation to pay Rent or of any other obligation under the related Lease.

(b) If any Equipment is lost, stolen or damaged beyond repair, or confiscated, seized or the use and/or title thereof requisitioned to someone other than Lessee (any such event being a "Total Loss"), Lessee shall immediately notify Lessor of such event. On the next Rent Payment Date following the occurrence of the Total Loss, at Lessor's option, Lessee shall either (i) replace Equipment with equipment that, in Lessor's sole opinion, is of the same manufacture, value, remaining useful life and utility as the replaced Equipment immediately preceding the Total Loss, assuming such replaced Equipment was in the condition required by the Lease or (ii) pay to Lessor the sum of (A) all Rent due and owing under the Lease with respect to such Equipment (at the time of such payment) plus (B) the Stipulated Loss Value for the Equipment as of that Rent Payment Date. If Lessor elects to allow replacement of Equipment as set forth in subsection (i) above, Lessee shall cause the Supplier of such replacement equipment to deliver to Lessor a bill of sale for such equipment free and clear of all liens and encumbrances, and such replacement equipment shall become Equipment subject to the applicable Lease. Upon Lessor's receipt of the amounts specified in subsection (ii) above, Lessee shall be entitled to Lessor's interest in the replaced Equipment, in its then condition and location, "as is" and "where is," without any warranties, express or implied.

**14.     Insurance.** (a) Lessee shall, at all times during the Term of each Lease and at Lessee's own cost and expense, maintain (i) insurance against all risks of physical loss or damage to Equipment for the Stipulated Loss Value thereof, and (ii) commercial general liability insurance (including blanket contractual liability coverage and products liability coverage) for personal and bodily injury and property damage per occurrence as stated in each Schedule.

(b) All insurance policies required hereunder shall include terms, and be with insurance carriers, reasonably satisfactory to Lessor. Without limiting the generality of the foregoing, each policy shall include the following terms: (i) all physical damage insurance shall name Lessor and its assigns as loss payee, (ii) all liability insurance shall name Lessor and its assigns as additional insureds, (iii) the policy shall not be canceled or altered without at least thirty days advance notice to Lessor and its assigns and (iv) coverage shall not be invalidated against Lessor or its assigns because of any violation of any condition or warranty contained in any policy or application therefor by Lessee or by reason of any action or inaction of Lessee. On each anniversary of the Rent Commencement Date during the term hereof, Lessee shall deliver to Lessor certificates or other proof of insurance satisfactory to Lessor evidencing the coverage required by this section.

**15.     Taxes.** Lessee shall pay when due and shall indemnify and hold harmless Lessor (on an after-tax basis) from and against any and all taxes, fees, withholdings, levies, imposts, duties, assessments and charges of every kind and nature whatsoever (including any related penalties and interest) imposed upon or against Lessor, any Lessor Assignee, Lessee or any Equipment by any governmental authority in connection with, arising out of or otherwise related to Equipment, the Lease Documents or the Rent and receipts or earnings arising therefrom, and, unless otherwise provided in the Lease Documents, excepting only all Federal, state and local taxes on or measured by Lessor's net income. Whenever each Lease expires, terminates or is canceled as to any Equipment, Lessee, upon written request by Lessor, shall advance to Lessor the amount estimated by Lessor to be the taxes on said Equipment that are not yet payable, but for which Lessee is responsible. At Lessee's request, Lessor shall provide Lessee with Lessor's method of computation of any such estimated taxes.

**16.     Lessor's Right to Perform for Lessee.** If Lessee fails to perform any of its obligations contained herein, Lessor may (but shall not be obligated to), with notice to Lessee, itself perform such obligations, and the amount of the reasonable costs and expenses of Lessor incurred in connection with such performance, together with interest on such amount at the lesser of eighteen percent per annum or the maximum permitted by law, shall be payable by Lessee to Lessor upon demand. No such performance by Lessor shall be deemed a waiver of any rights or remedies of Lessor or be deemed to cure the default of Lessee hereunder.

**17.     Personal Property; Liens.** Lessee represents and warrants that the Equipment is, and shall at all times remain, fully removable personal property notwithstanding any affixation or attachment to real property or improvements. Lessee shall at all times keep Equipment free and clear from all liens and encumbrances of any kind or nature other than those created by, through or under Lessor. If, in violation of the foregoing covenant, any prohibited lien or encumbrance shall attach to Equipment, Lessee shall (a) give Lessor immediate written notice thereof and (b) promptly, at Lessee's sole cost and expense, take such action as may be necessary to discharge such lien.

**18.     Default; Remedies.** (a) As used herein, the term "Default" means any of the following events: (i) Lessee fails to pay any Rent or other amount due under a Lease within ten days after the same shall have become due; (ii) Lessee or any Guarantor becomes insolvent or makes an assignment for the benefit of its creditors; (iii) a receiver, trustee, conservator or liquidator of Lessee or any Guarantor of all or a substantial part of Lessee's or such Guarantor's assets is appointed with or without the application or consent of Lessee or such Guarantor, respectively; (iv) a petition is filed by or against Lessee or any Guarantor under any bankruptcy, insolvency or similar law; (v) Lessee or any Guarantor violates or fails to perform any

provision of either this Lease or any other loan, lease or credit agreement or any acquisition or purchase agreement with Lessor or any other party, which Default continues unremedied by Lessee for a period of thirty (30) days after notice thereof from Lessor to Lessee; (vi) Lessee or any counterparty violates or fails to perform any provision (which violation or failure continues unremedied after the lapse of any applicable cure periods) of the power purchase agreement, net metering agreement or solar renewable energy credit agreement related to the Equipment which is subject to the Lease, the interconnection agreement or any other contract, license or regulation related thereto, which Default continues unremedied by Lessee for a period of thirty (30) days after notice thereof from Lessor to Lessee, or such power purchase agreement, net metering agreement or solar renewable energy credit agreement is terminated by either party prior to the completion of its present term; or, there takes place a sale and transfer of the Equipment, pursuant to that certain power purchase agreement, net metering agreement or solar renewable energy credit agreement or any other agreement; (vii) any warranty or representation made by Lessee herein proves to have been false or misleading when made which Default continues unremedied by Lessee for a period of thirty (30) days after notice thereof from Lessor to Lessee; (viii) there is a material adverse change in Lessee's or any Guarantor's financial condition since the related Rent Commencement Date, which Default continues unremedied by Lessee for a period of thirty (30) days after notice thereof from Lessor to Lessee; (ix) Lessee or any Guarantor merges or consolidates with any other corporation or entity, or sells, leases or disposes of all or substantially all of its assets without the prior written consent of Lessor; (x) Lessee or any Guarantor, if an individual, dies or, if not an individual, is dissolved; (xi) a change in control occurs in Lessee or any Guarantor; (xii) any filing by Lessee of a termination statement for any financing statement filed by Lessor while any obligations are owed by Lessee under a Lease which Default continues unremedied by Lessee for a period of thirty (30) days after notice thereof from Lessor to Lessee.  A Default with respect to any Lease shall, at Lessor's option, constitute a Default for all Leases and any other agreements between Lessor and Lessee; or (xiii) the occurrence of an event of default under any Lease Document.

(b) Upon the occurrence of a Default, Lessor may do one or more of the following as Lessor in its sole discretion shall elect: (i) proceed by appropriate court action to enforce performance by Lessee of the related Lease or to recover damages, including incidental and consequential damages, for the breach thereof; (ii) cause Lessee, at its expense, promptly to assemble Equipment and return the same to Lessor at such place as Lessor may designate in writing; (iii) by notice in writing to Lessee, cancel or terminate the related Lease, without prejudice to any other remedies hereunder; (iv) enter upon the premises of Lessee or other premises where any Equipment may be located and, without notice to Lessee and with or without legal process, take possession of and remove all or any such Equipment without liability to Lessee by reason of such entry or taking possession, and without such action constituting a cancellation or termination of the Lease unless Lessor notifies Lessee in writing to such effect; (v) by written notice to Lessee specifying a payment date (the "Remedy Date"), demand that Lessee pay to Lessor, and Lessee shall pay to Lessor, on the Remedy Date, as liquidated damages for loss of a bargain and not as a penalty, a sum equal to (A) any unpaid Rent due prior to the Remedy Date (together with interest on such amount at the lesser of eighteen percent per annum or the maximum permitted by law from the Remedy Date to the date of actual payment), plus (B) the Stipulated Loss Value; (vi) sell Equipment at public or private sale or hold, keep idle or lease to others any Equipment; and (vii) exercise any other right or remedy available to Lessor under applicable law. In addition, Lessee shall be liable for all reasonable costs, expenses, and legal fees incurred in enforcing Lessor's rights under the Lease, before or in connection with litigation or arbitration and for any deficiency in the disposition of the Equipment. Lessor's recovery hereunder shall in no event exceed the maximum recovery permitted by law.

(c) If a Default occurs, Lessee hereby agrees that ten days' prior notice to Lessee of any public sale or of the time after which a private sale may be negotiated shall be conclusively deemed reasonable notice. None of Lessor's rights or remedies hereunder are intended to be exclusive, but each shall be cumulative and in addition to any other right or remedy referred to hereunder or otherwise available to Lessor at law or in equity, and no express or implied waiver by Lessor of any Default shall constitute a waiver of any other Default or a waiver of any of Lessor's rights.

(d) With respect to any exercise by Lessor of its right to recover and/or dispose of any Equipment or any other collateral securing Lessee's obligations under any Lease, Lessee acknowledges and agrees that Lessor may dispose of Equipment on an "AS-IS, WHERE-IS" basis, in compliance with applicable law and with such preparation (if any) as Lessor determines to be commercially reasonable. Lessee shall remain liable for any deficiency in the disposition of the Equipment, and any purchase by Lessor of the Equipment may be through a credit to some or all of Lessee's obligations under any Lease.

**19.**      **Notices**. Lessee shall furnish Lessor with prompt written notice with full details (x) of the occurrence of any event

which constitutes a Default hereunder (or the existence of any condition or circumstance which with the lapse of time or giving of notice or both would constitute a Default hereunder) or which might materially adversely affect the financial condition or operations of Lessee or Guarantor, including without limitation the filing or commencement of any action, suit or proceeding before any arbitrator or governmental authority against or affecting Lessee or the power purchase agreement related to the Equipment which is subject to the Lease, the interconnection agreement or any other contract, license or regulation related thereto or (y) if such power purchase agreement, net metering agreement or solar renewable energy credit agreement is terminated by either party prior to the completion of its present term. All notices and other communications hereunder shall be in writing and shall be transmitted by hand, overnight courier or certified mail (return receipt requested), US postage prepaid.

Such notices and other communications shall be addressed to the respective party at the address set forth above or at such other address as any party may, from time to time, designate by notice duly given in accordance with this section. Such notices and other communications shall be effective upon the earlier of receipt or three days after mailing if mailed in

accordance with the terms of this section.

**20.     Indemnity.** Lessee shall indemnify and hold harmless Lessor and each Lessor Assignee, on an after tax basis, from and against any and all liabilities, causes of action, claims, suits, penalties, damages, losses, costs or expenses (including attorneys' fees), obligations, demands and judgments (collectively, a "Liability") arising out of or in any way related to: (a) Lessee's failure to perform any covenant under the Lease Documents, (b) the untruth or inaccuracy of any representation or warranty made by Lessee under the Lease Documents, (c) the order, manufacture, purchase, ownership, selection, acceptance, rejection, possession, rental, sublease, operation, use, maintenance, control, loss, damage, destruction, removal, storage, surrender, sale, condition, delivery, return or other disposition of or any other matter relating to any Equipment or (d) injury to persons, property or the environment including any Liability based on strict liability in tort, negligence, breach of warranties or Lessee's failure to comply fully with applicable law or regulatory requirements; *provided*, that the foregoing indemnity shall not extend to any Liability to the extent resulting solely from the gross negligence or willful misconduct of Lessor.

**21.     Fees and Expenses.** Lessee shall pay all reasonable costs and expenses of Lessor, including, without limitation, attorneys' and other professional fees, returned check or non-sufficient funds charges, the fees of any collection agencies and appraisers and all other costs and expenses related to any sale or re-lease of Equipment (including storage costs) incurred by Lessor in enforcing any of the terms, conditions or provisions hereof or in protecting Lessor's rights hereunder.

**22.     Financial and Other Data.** During the Term hereof, Lessee shall furnish Lessor (a) as soon as available, and in any event within one hundred twenty days after the last day of each fiscal year, financial statements of Lessee and each Guarantor and (b) from time to time as Lessor may reasonably request, other financial reports, information or data (including federal and state income tax returns) and quarterly or interim financial statements of Lessee and each Guarantor. All such information shall be audited (or if audited information is not available, compiled or reviewed) by an independent certified public accountant.

**23.     Indebtedness.** Lessee will not, and will not permit any subsidiary of Lessee to, create, incur, assume or permit to exist, directly or indirectly, any Indebtedness except Indebtedness to Lessor. As used herein, "Indebtedness" means, in respect of any person, all items (other than capital stock, including membership interests, additional paid-in capital, retained earnings and deferred credits), which in accordance with generally accepted accounting principles in the United States of America as in effect from time to time, consistently applied, would be included in determining total liabilities as shown on the liabilities side of a balance sheet as at the date on which Indebtedness is to be determined. "Indebtedness" shall also include, whether or not so reflected, (i) indebtedness, obligations and liabilities secured by any conditional sale agreement or other title retention agreements (e.g., leases) related to property acquired by such person, or secured by any mortgage, pledge or lien existing on property owned subject to such conditional sale agreement or title retention agreement, mortgage, pledge or lien whether or not the indebtedness, obligations or liabilities secured thereby shall have been assumed, (ii) all guaranties made by such person and (iii) the amount of any reimbursement obligation in respect of any letter of credit.

**24.     Representations and Warranties of Lessee.** Lessee represents and warrants that (a) the address stated above is the chief place of business and chief executive office of Lessee, Lessee's full and accurate legal name is as stated above and the information describing Lessee set forth under Lessee's signature below is accurate in all respects; (b) Lessee is either (i) an individual and the sole proprietor of its business which is located at the address set forth above and doing business only under the names disclosed herein, or (ii) a limited liability company or corporation duly organized and validly existing in good standing under the laws of the state of its organization or incorporation, or (iii) a general or limited partnership organized under the laws of the state of its principal place of business set forth in the Lease or the Lease Documents and the individual general partner executing this Master Lease has the full authority to represent, sign for and bind Lessee in all respects; (c) the execution, delivery and performance of this Master Lease and all related instruments and documents (i) have been duly authorized by all necessary action on the part of Lessee, (ii) do not require the approval of any stockholder, partner, manager, trustee, or holder of any obligations of Lessee except such as have been duly obtained, and (iii) do not and will not contravene any law, governmental rule, regulation or order now binding on Lessee, or contravene the operating agreement, charter or by-laws of Lessee, or constitute a default under, or result in the creation of any lien or encumbrance upon the property of Lessee under, any indenture, mortgage, contract or other agreement to which Lessee is a party or by which it or its property is bound; (d) the Lease Documents when entered into will constitute legal, valid and binding obligations of Lessee enforceable against Lessee in accordance with their terms except to the extent limited by state and federal law affecting creditor's remedies and by bankruptcy, reorganization, moratorium or other laws of general application relating to or affecting the enforcement of creditors' rights; (e) there are no actions or proceedings to which Lessee is a party, and there are no other threatened actions or proceedings of which Lessee has knowledge, before any governmental authority which, either individually or in the aggregate, would adversely affect the financial condition of Lessee or the ability of Lessee to perform its obligations hereunder; (f) Lessee is not in default under any obligation for the payment of borrowed money, for the deferred purchase price of property or for the payment of any rent under any lease agreement which, either individually or in the aggregate, would adversely affect the financial condition of Lessee or the ability of Lessee to perform its obligations hereunder; (g) the Lease is for commercial and business purposes and the Equipment will be used solely for such purposes and not for personal, family, or household purposes; (h) the financial statements of Lessee (copies of which have been furnished to Lessor) have been prepared in accordance with generally accepted accounting principles consistently applied and fairly present Lessee's financial condition and the results of its operations as of the date and for the period covered by such statements, and since the date of such statements there has been no material adverse change in such conditions or operations; and (i) the Equipment (including warranties) will be classified as (i) "energy property" under Code Section 48 and (ii) "5-year property" under Code Section 168; and (j) Lessor will be entitled to (i) 5-year MACRS depreciation under Code Section 168 and (ii) 30% investment tax

credit under Code Sections 46 and 48 with respect to the cost basis of the Equipment (including warranties).

**25.      Lessee's Waivers.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE WAIVES (a) ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE BY ARTICLE 2A OF THE UCC AND (b) ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE TO RECOVER INCIDENTAL OR CONSEQUENTIAL DAMAGES FROM LESSOR FOR ANY BREACH OF WARRANTY OR FOR ANY OTHER REASON OR TO SET OFF OR DEDUCT ALL OR ANY PART OF ANY CLAIMED DAMAGES RESULTING FROM LESSOR'S DEFAULT, IF ANY, UNDER THE RELATED LEASE.

**26.      UCC Filings.** LESSEE HEREBY AUTHORIZES LESSOR TO AUTHENTICATE AND/OR FILE ALL UCC FINANCING STATEMENTS AND AMENDMENTS THAT IN LESSOR'S SOLE DISCRETION ARE DEEMED NECESSARY OR PROPER TO SECURE OR PROTECT LESSOR'S INTEREST IN EQUIPMENT IN ALL APPLICABLE JURISDICTIONS. Lessee hereby ratifies, to the extent permitted by law, all that Lessor shall lawfully and in good faith do or cause to be done by reason of and in compliance with this section. Lessee shall provide written notice to Lessor at least thirty days prior to any contemplated change in Lessee's name, jurisdiction of organization or chief executive office address.

**27.      Condition Precedent to the Master Lease and each Schedule**. As a condition precedent to the execution of this Master Lease and to the execution and funding of each Schedule, in addition to and subject to the terms and conditions of such Schedule, there shall have been no material adverse change in the financial condition and the results of the operations of Lessee or of any party to the power purchase agreement, net metering agreement or solar renewable energy credit agreement related to the Equipment which is subject to the Master Lease. Lessee represents and warrants that, as at the respective dates of this Master Lease and of each Schedule, there has been no material adverse change in the financial condition and the results of the operations of Lessee or of any party to the power purchase agreement, net metering agreement or solar renewable energy credit agreement related to the Equipment which is subject to the Lease.

**28.      Miscellaneous; Governing Law**. Time is of the essence with respect to each Lease. Any failure of Lessor to require strict performance by Lessee or any waiver by Lessor of any provision of a Lease shall not be construed as a consent or waiver of any provision of such Lease. The Lease will be binding upon Lessor only if executed by a duly authorized officer or representative of Lessor at Lessor's address set forth above. An authorized signer of Lessee shall execute the Lease Documents on Lessee's behalf. Any provision of a Lease that is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof. Captions are intended for convenience or reference only, and shall not be construed to define, limit or describe the scope or intent of any provisions hereof. Lessee will promptly execute or otherwise authenticate and deliver to Lessor such further documents, instruments, assurances and other records and take such further action as Lessor may reasonably request in order to carry out the intent and purpose of this agreement and each Lease and to establish and protect the rights and remedies created or intended to be created in favor of Lessor hereunder and thereunder. THIS LEASE IS BEING DELIVERED IN, AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF, THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAWS (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW). ANY ACTION BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS LEASE OR THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING NON-CONTRACTUAL CLAIMS, SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT LOCATED IN THE STATE OF NEW YORK; PROVIDED, THAT AT LESSOR'S SOLE OPTION, LESSOR MAY BRING AN ACTION IN THE STATE WHERE LESSEE OR THE EQUIPMENT IS LOCATED. LESSEE IRREVOCABLY WAIVES OBJECTIONS TO THE JURISDICTION OF SUCH COURTS AND WAIVES ANY ARGUMENT THAT VENUE IN ANY SUCH FORUM IS NOT CONVENIENT. LESSOR AND LESSEE HEREBY EACH WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO EQUIPMENT OR EACH LEASE. THIS WAIVER IS MADE KNOWINGLY, WILLINGLY AND VOLUNTARILY BY LESSOR AND LESSEE WHO EACH ACKNOWLEDGE THAT NO REPRESENTATIONS HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO EACH LEASE AND THE LEASE DOCUMENTS.

**29.      Quiet Enjoyment**. So long as no Default has occurred and is continuing, Lessee shall peaceably hold and quietly enjoy Equipment without interruption by Lessor or any person or entity claiming through Lessor.

**30.      Entire Agreement**. Each Lease, together with all other Lease Documents, constitutes the entire understanding or agreement between Lessor and Lessee with respect to the leasing of Equipment covered thereby, and there is no understanding or agreement, oral or written, which is not set forth herein or therein. No Lease may be amended except by a writing signed by Lessor and Lessee. Delivery of an executed Lease Document by facsimile or any other reliable means shall be deemed as effective for all purposes as delivery of a manually executed copy. Lessee shall provide to Lessor the manually executed original of any Lease Document delivered by facsimile within five days.

**31.      More than One Lessee**. If more than one person or entity executes the Lease Documents as "Lessee," the obligations of "Lessee" shall be deemed joint and several and all references to "Lessee" shall apply both individually and jointly.

32.     **Disclaimer of Warranties. LESSOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, TITLE TO, DESIGN, OPERATION, CONDITION, OR QUALITY OF THE MATERIAL OR WORKMANSHIP IN, EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE, THE ABSENCE OF LATENT OR OTHER DEFECTS (WHETHER OR NOT DISCOVERABLE), LACK OF INFRINGEMENT ON ANY PATENT, TRADEMARK OR COPYRIGHT, AND LESSOR HEREBY DISCLAIMS ALL SUCH WARRANTIES; IT BEING UNDERSTOOD THAT THE EQUIPMENT IS LEASED TO LESSEE "AS IS, WHERE IS." LESSEE HAS MADE THE SELECTION OF THE EQUIPMENT FROM THE SUPPLIER BASED ON ITS OWN JUDGMENT AND EXPRESSLY DISCLAIMS ANY RELIANCE ON ANY STATEMENTS OR REPRESENTATIONS MADE BY LESSOR. IN NO EVENT SHALL LESSOR BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES. LESSOR HEREBY ASSIGNS TO LESSEE FOR THE TERM OF EACH LEASE WITHOUT RECOURSE AND FOR SO LONG AS LESSEE IS NOT IN DEFAULT UNDER ANY LEASE, ANY WARRANTY PROVIDED BY THE SUPPLIER.**

32.     **Execution in Counterparts**. The Master Lease and all other Lease Documents may be executed in several counterparts and by different parties hereto or thereto on separate counterparts, each of which when so executed or otherwise authenticated and delivered shall be an original, but all such counterparts shall together consist of one and the same instrument; except, to the extent that any Lease Documents constitute chattel paper under the UCC, no security interest therein may be created other than through the transfer or possession of the original counterpart, which shall be identified by Lessor.

33.     **Software**. To the extent that any Schedule relates to Software:

(a) Lessee acknowledges that (i) all Software is furnished to Lessee under one or more separate License Agreements governing Lessee's rights thereto, (ii) the Lease does not convey any explicit or implicit license for the use of Software or other intellectual property relating to Equipment, and (iii) Lessor does not hold title to any Software and Lessee is or shall be the licensee of such Software directly from the Licensor.

(b) Lessee shall not amend, modify or otherwise alter, any term or condition of any License Agreement, including, without limitation, any such term or condition related to (i) payment of any amounts due thereunder, (ii) any liabilities or obligations of Lessee as licensee, (iii) the payment of late fees on past due amounts, or (iv) the payment of applicable taxes; provided, however, that this provision shall not apply to those terms or conditions relating solely to amounts owing to Licensor which have not been financed under the Lease.

**IN WITNESS WHEREOF**, Lessor and Lessee have executed this Master Lease as of the day and year first above written.

Lessor:

**KEY EQUIPMENT FINANCE, A DIVISION OF KEYBANK NATIONAL ASSOCIATION**

By: *Cynthia L George*

Name:       Cynthia L. George
                  Designated Signer
Title:        Key Equipment Finance

Lessee:

**ALBANY CSD SOLAR 1 LLC**

By: _____

Name: Mark Fonare
Title: General Manager

Organization Type: Limited Liability Company

Jurisdiction of New York

Organizational No.: 61-1816402

**<u>EXHIBIT 44</u>**

**(Albany CSD Solar 1 Security Agreement)**

C#:581050464



## Continuing Security Agreement

In consideration of any loans, advances or financial accommodations previously, now or hereafter made or granted by **KEY EQUIPMENT FINANCE, A DIVISION OF KEYBANK NATIONAL ASSOCIATION** ("KEF") with offices at 1000 S. McCaslin Blvd., Superior, CO 80027 to Albany CSD Solar 1 LLC ("Grantor") with its principal offices at 444 Washington Street, Rensselaer, NY 12144, Grantor agrees as follows:

1. **Definitions**. (a) As used in this Agreement, the following terms shall have the following respective meanings:

(i) "Agreement" means this Agreement;

(ii) "Other Agreements" means any lease, note, guaranty, agreement or document heretofore, now or hereafter executed (x) by Grantor for KEF's benefit or (y) by Grantor and transferred, assigned or pledged to KEF, including (without limitation) that certain Master Equipment Lease Agreement dated as of March 16, 2017 (the "Master Lease") between Grantor and KEF and all Lease Documents (as defined in the Master Lease);

(iii) "Obligations" means all of Grantor's now existing or hereafter arising payment and performance obligations to KEF howsoever created by Grantor or acquired by KEF, including (without limitation) those arising under the Lease Documents; and

(iv) "Policies" means all policies of insurance required hereunder or under an Other Agreement to be maintained with respect to the Equipment.

(v) "Power Purchase Agreement" means that certain Power Purchase Agreement dated as of September 3, 2013, as amended, modified, supplemented or restated from time to time in accordance with the terms hereof, between City School District of Albany ("Buyer") and Monolith Solar Investors LLC ("Previous Provider"), as assigned by Pervious Provider to Grantor pursuant to that certain Assignment of Power Purchase Agreement and Related Documents dated on or about February 24, 2017.

(b) Each term defined in such of the Other Agreements as have been executed between KEF and Grantor or by Grantor specifically for KEF's benefit and not defined in this Agreement, shall have the meaning provided in such Other Agreement. Any term used in this Agreement and not defined herein or in such Other Agreement shall have the meaning provided in the Uniform Commercial Code ("UCC") as enacted in the state identified in Section 16 hereof.

2. **Collateral**. (a) To secure payment and performance of all of Grantor's Obligations, Grantor hereby grants to KEF a security interest in and to all of Grantor's Accounts, Chattel Paper, Inventory, Equipment, Instruments, Investment Property, Documents, Letter-of-Credit rights, General Intangibles and the Power Purchase Agreement, now owned or hereafter acquired, arising or entered into, including without limitation the right to payment to Grantor (but without assumption of any liabilities of Grantor) under the Power Purchase Agreement, each other power purchase agreement, solar renewable energy credit agreement, engineering, procurement and construction agreement, interconnection agreement and solar site lease related to the Equipment which is subject to Other Agreements, including any lease between KEF and Grantor, together with any additions, accessions or substitutions thereto or replacements thereof and any products or proceeds, including insurance proceeds, of the foregoing, and which includes, without limitation, the right to payment to Grantor (but without assumption of any liabilities of Grantor) under that certain Standard Performance Agreement for PV between Grantor and New York State Energy Research and Development Authority ("NYSERDA Agreement") and the NYSERDA Agreement (collectively, the "Collateral").

(b) Grantor shall make appropriate entries on its books and records disclosing KEF's security interests in the Collateral. Except for certain titled vehicles, the Equipment is now and shall at all times while any Obligations are outstanding be located at Grantor's address set forth above and shall not be removed therefrom without KEF's prior written consent. Under no circumstances whatsoever shall Grantor remove any item of Equipment outside the continental United States.

(c) Grantor hereby authorizes KEF to authenticate and/or file all UCC financing statements and amendments that in KEF's sole discretion are deemed necessary or proper to secure or protect KEF's interest in the Collateral in all applicable jurisdictions. Grantor hereby ratifies, to the extent permitted by law, all that KEF shall lawfully and in good faith do or cause to be done by reason of and in compliance with this section. Grantor shall provide written notice to KEF at least thirty days prior to any contemplated change in its name, jurisdiction of organization or chief executive office address.

(d) Grantor shall have possession of the Collateral except where expressly otherwise provided in this Agreement or in Other Agreements to which KEF has reviewed and approved and chooses to perfect KEF's security interest by possession in addition to the filing of a financing statement. Where Collateral is in the possession of a third party, Grantor will join with KEF in notifying the third party of KEF's security interest and obtaining an acknowledgment from the third party that it is holding the Collateral for KEF's benefit.

(e) If any lien or encumbrance other than KEF's shall attach to the Collateral, Grantor shall (i) give KEF immediate written notice thereof and (ii) promptly, at Grantor's sole cost and expense, take such action as may be necessary to discharge such lien.

(f) Grantor will not create any Chattel Paper without placing a legend on the Chattel Paper acceptable to KEF indicating that KEF has a security interest in the Chattel Paper.

3. **Affirmative Warranties, Representations and Covenants**. Except as otherwise specifically provided in any of the Other Agreements, Grantor warrants and represents to, and covenants with KEF, that: (a) unless KEF otherwise expressly agrees in writing, KEF's security interest in each item of Collateral (i) is now and shall at all times constitute a first priority security interest in such Collateral and (ii) is not now and shall not become subordinate or junior to the lien or claim of any person or entity; (b) Grantor has the right and power and is duly authorized to enter into this Agreement; (c) Grantor's execution of this Agreement does not constitute a breach of any provision contained in its articles of incorporation or bylaws or partnership agreement, as the case may be, or of which Grantor is bound; (d) all taxes, assessments and governmental charges of any nature which are or may be due by Grantor in

connection with any part of the Collateral have been fully paid, and Grantor shall maintain reserves adequate in amount to fully pay, and shall promptly pay when due (unless timely and appropriately contested), all such liabilities which may hereafter accrue; (e) Grantor shall permit KEF (or any person designated by KEF) during our usual business hours, to have access to examine any and all of Grantor's books and records in connection with the Collateral and permit the copying of the same; (f) Grantor shall keep and maintain all of the Collateral in good operating condition and repair and shall make all necessary replacements of and renewals thereto so that the value and operating efficiency thereof shall at all times be maintained and preserved; (g) Grantor shall faithfully abide by, perform and discharge each and every obligation, covenant, condition and agreement of the Power Purchase Agreement to be performed by Grantor and to enforce performance by Buyer thereto of each and every obligation, covenant, condition and agreement to be performed by Buyer thereunder and shall exercise at KEF's direction, any rights or remedies of Grantor under the Power Purchase Agreement; (h) Grantor is not in default under the Power Purchase Agreement, and to the best knowledge of Grantor, Buyer is not in default thereunder; (i) the Power Purchase Agreement shall not be terminated and Grantor shall not consent to any termination thereof without the prior written consent of KEF; (j) the Power Purchase Agreement provided by Grantor to KEF is a true, complete and correct copy of the Power Purchase Agreement and all amendments thereto, fully executed by all parties thereto; (k) the Power Purchase Agreement is in full force and effect; and (I) Grantor shall provide KEF copies of all written notices delivered by Buyer to Grantor.

4. **Negative Covenants**. Grantor covenants with KEF that Grantor shall not, without KEF's prior written consent: (a) grant to or in favor of any person or entity (other than KEF a security interest in or permit to exist a lien or claim upon any of the Collateral; (b) permit any levy, attachment or restraint to be made affecting any of the Collateral; (c) permit any Collateral to become a fixture to real estate or accession to other property; (d) sell, lease, assign, transfer or in any other manner dispose of, encumber or permit the disposition or encumbrance of any Collateral; or interest therein; (e) alter or modify in any manner the lockbox payment instructions, previously approved by KEF, for receipt of the proceeds of Collateral; or (f) alter, modify or amend in any manner the Power Purchase Agreement or exercise any rights or remedies of Grantor under the Power Purchase Agreement.

5. **Warranties True; Survival**. All of Grantor's warranties, representations and covenants in this Agreement and all conditions to be performed by Grantor pursuant to this Agreement are true, have been satisfied at the time of Grantor's execution of this Agreement and shall survive the execution, delivery and closing of this Agreement.

6. **Insurance**. (a) Grantor shall, so long as this Agreement remains in effect and at Grantor's own cost and expense, maintain (i) insurance against all risks of physical loss or damage to the Collateral, and (ii) commercial general liability insurance (including blanket contractual liability) for personal and bodily injury and property damage relating to Grantor's ownership of the Collateral as well as automobile liability insurance for Collateral consisting of motor vehicles.
(b) All insurance policies required hereunder shall include terms, and be with insurance carriers, reasonably satisfactory to KEF. Without limiting the generality of the foregoing, each policy shall include the following terms: (i) all physical damage insurance shall name KEF and KEF's assigns as loss payee, (ii) all liability insurance shall name KEF and KEF's assigns as additional insureds, (iii) the policy shall not be canceled or altered without at least thirty days advance notice to KEF and KEF's assigns and (iv) coverage shall not be invalidated against KEF or KEF's assigns because of any violation of any condition or warranty contained in any policy or application therefor by Grantor or by reason of Grantor's action or inaction. Upon KEF's request, Grantor shall deliver to KEF certificates or other proof of insurance satisfactory to KEF evidencing the coverage required by this section.

7. **Indemnity.** Grantor hereby indemnifies and holds harmless KEF and each of KEF's assigns, on an after tax basis, from and against any and all liabilities, causes of action, claims, suits, penalties, damages, losses, costs or expenses (including attorneys' fees), obligations, demands and judgments (collectively, a "Liability") arising out of or in any way related to: (a) Grantor's failure to perform any covenant under this Agreement, (b) the untruth of any representation or warranty made by Grantor under this Agreement, or (c) injury to persons, property or the environment including any Liability based on strict liability in tort, negligence, breach of warranties or Grantor's failure to comply fully with applicable law or regulatory requirements; *provided*, that the foregoing indemnity shall not extend to any Liability to the extent resulting solely from KEF's gross negligence or willful misconduct.

8. **Default.** (a) As used herein, the term "Default" means any of the following events:  (i) Grantor fails to pay any installment or other amount due under any Other Agreement within ten days after the same shall have become due; (ii) Grantor becomes insolvent or makes an assignment for the benefit of its creditors; (iii) a receiver, trustee, conservator or liquidator of all or a substantial part of Grantor's assets with or without Grantor's application or consent; (iv) a petition is filed by or against Grantor under any bankruptcy, insolvency or similar law; (v) Grantor violates or fails to perform any provision of either this Agreement or any other loan, credit agreement, lease or any acquisition or purchase agreement with KEF or any other party which Default continues unremedied by Grantor for a period of thirty (30) days after notice thereof from KEF to Grantor; (vi) any warranty or representation made by Grantor herein proves to have been false or misleading when made which Default continues unremedied by Grantor for a period of thirty (30) days after notice thereof from KEF to Grantor; (vii) there is a material adverse change in Grantor's financial condition since the execution of any Other Agreement which Default continues unremedied by Grantor for a period of thirty (30) days after notice thereof from KEF to Grantor; (viii) Grantor merges or consolidates with any other corporation or entity, or sells, leases or disposes of all or substantially all of Grantor's assets without KEF's prior written consent; (ix) Grantor, if an individual, dies or, if not an individual, is dissolved; or (x) any filing by Grantor of a termination statement for any financing statement filed by KEF while any Obligations are owed by Grantor which Default continues unremedied by Grantor for a period of thirty (30) days after notice thereof from KEF to Grantor; (xi) any of the events described in subsections (ii) through (ix) above occurs with respect to any guarantor of the Obligations, or (xii) a default (after any applicable notice and cure periods) occurs under the Power Purchase Agreement or the Power Purchase Agreement terminates for any reason. A Default with respect to any Other Agreement shall constitute a Default for any other such Other Agreements as KEF shall elect.
(b) In the event of a Default by Grantor, Grantor waives and releases (i) any right Grantor may have to assert, by way of counterclaim or affirmative defense in any action to enforce Grantor's obligations hereunder, any claim whatsoever against KEF; (ii) any

and all claims and causes of action which Grantor may now or ever have against KEF as a result of any possession, repossession, collection or disposition by KEF of any of the Collateral, notwithstanding the effect of any such action upon Grantor's business; (iii) all rights of redemption from any such sale; and  (iv) the benefit of all valuation, appraisal and exemption laws. If KEF seek to take possession of any of the Collateral by replevin or other court process, Grantor hereby irrevocably waive any bonds, surety and security relating thereto required by any statute, court rule or otherwise as an incident to such possession and any demand for possession of the Collateral prior to the commencement of any suit or action to recover possession thereof.

9. **Remedies.** (a) Upon the occurrence of a Default, KEF may do one or more of the following as KEF in KEF's sole discretion shall elect: (i) proceed by appropriate court action to enforce performance or to recover damages, including incidental and consequential damages, for Grantor's breach of this Agreement; (ii) cause Grantor, at Grantor's expense, to promptly assemble Collateral and deliver the same to KEF at such place as KEF may designate in writing; (iii) by notice in writing to Grantor, cancel or terminate any Other Agreement without prejudice to any other remedies hereunder; (iv) enter upon Grantor's premises or other premises where any Collateral may be located and (subject to the rules, regulations and procedures of the owner of such other premises where such other Collateral may be located), without notice to Grantor and with or without legal process, take possession of and remove all or any such Collateral without liability to Grantor's by reason of such entry or taking possession and without such action constituting a cancellation or termination of any Other Agreement unless KEF notifies Grantor in writing to such effect; (v) sell Collateral at public or private sale or hold, keep idle or lease to others any Collateral; and (vii) exercise any other right or remedy available to KEF under applicable law. In addition, Grantor shall be liable for all reasonable costs, expenses, and legal fees incurred in enforcing KEF's rights under this Agreement, before or in connection with litigation or arbitration and for any deficiency in the disposition of the Collateral. All of KEF's rights and remedies granted under this Agreement and the Other Agreements are cumulative and non-exclusive.

(b) If a Default occurs, Grantor hereby agree that ten days' prior notice to Grantor of any public sale or of the time after which a private sale may be negotiated shall be conclusively deemed reasonable notice. None of KEF's rights or remedies hereunder are intended to be exclusive, but each shall be cumulative and in addition to any other right or remedy referred to hereunder or otherwise available to KEF at law or in equity, and no express or implied waiver by KEF of any Default shall constitute a waiver of any other Default or a waiver of any of KEF's rights.

(c) With respect to any exercise by KEF of KEF's right to recover and/or dispose of any Collateral, Grantor acknowledges and agrees that KEF may dispose of Collateral on an "AS-IS, WHERE-IS" basis, in compliance with applicable law and with such preparation (if any) as KEF determine to be commercially reasonable. Grantor shall remain liable for any deficiency in the disposition of the Collateral, and any purchase by KEF of the Collateral may be through a credit to some or all of Grantor's obligations under any Other Agreement.

(d) If a Default occurs, KEF may, at its option, without notice, and without regard to the adequacy of security for the Obligations hereby secured, either in person or by agent, with or without bringing any action or proceeding, or by a receiver to be appointed by a court at any time hereafter, enforce for its own benefit the Power Purchase Agreement.  The exercise of any rights under this Agreement shall not be deemed to cure or waive any default under any of the Other Documents, or waive, modify or affect any notice of default under any of the Other Documents, or invalidate any act done by KEF pursuant to or following such notice.

(e)    If a Default occurs, Grantor acknowledges and agrees that KEF may, at its option, instruct Buyer to pay all amounts due and owing under the Power Purchase Agreement directly to KEF to be applied against the Obligations.

10. **Notice.** All notices and other communications hereunder shall be in writing and shall be transmitted by hand, overnight courier or certified mail (return receipt requested), US postage prepaid. Such notices and other communications shall be addressed to the respective party at the address set forth above or at such other address as any party may, from time to time, designate by notice duly given in accordance with this section. Such notices and other communications shall be effective upon receipt or, in the case of mailing in accordance with the terms of this section, the earlier of receipt or three days after mailing.

11. **Collection; Demand; Waivers.** (a) Grantor agrees that all instruments delivered to KEF on account of the Obligations shall constitute conditional payment until KEF actually receives such funds.

(b) Grantor agrees that KEF shall have the continuing exclusive right to apply and reapply any and all payments received by KEF on account of the Obligations in such manner as KEF may deem advisable notwithstanding any entry by KEF upon any of KEF's books and records.

(c) **GRANTOR HEREBY WAIVES: (i) NOTICE AND OPPORTUNITY FOR HEARING; (ii) DEMAND, PROTEST AND NOTICES OF PROTEST OR DISHONOR; (iii) NOTICES OF PAYMENT AND NONPAYMENT; (iv) NOTICES OF DEFAULT, RELEASE, COMPROMISE, SETTLEMENT, EXTENSION OR RENEWAL OF ANY DOCUMENTS OR INSTRUMENTS AT ANY TIME HELD BY KEF ON WHICH GRANTOR MAY IN ANY WAY BE LIABLE; AND (v) NOTICE OF ACCEPTANCE OF THIS AGREEMENT.**

12. **Reimbursement**. Grantor shall pay KEF on demand all charges and expenses KEF incurs in protecting or enforcing KEF's security interests in the Collateral, in enforcing the payment or performance of the Obligations and in defending any claim asserted by Grantor's against KEF. Without waiving or releasing any Default or Obligation, KEF may perform any Obligations that Grantor fails or refuses to perform, and may, at any time or times hereafter, but shall be under no obligation to so do, pay, acquire or accept any assignment of any lien or claim against the Collateral asserted by any person or entity.

13. **Alterations; Waiver.** This Agreement may not be altered or amended except in a writing signed by KEF and Grantor's authorized representatives. KEF's failure at any time to require strict performance by Grantor of any agreement or Obligation shall not waive or diminish any right by KEF thereafter to demand strict compliance and performance. Any waiver by KEF of any Default by Grantor shall not waive or affect any other Default by Grantor, whether such Default is prior or subsequent to such other Default and whether of the same or a different type. None of Grantor's agreements and Obligations contained in this Agreement or any of the Other

Agreements, and no Default, shall be deemed waived by KEF unless such waiver is by a written instrument specifying such waiver, signed by one of KEF's officers and directed to Grantor. Upon Grantor's payment in full to KEF of the Obligations, Grantor shall release KEF of any and all claims, causes of action, debts and liabilities relating in any manner whatsoever to the Collateral.

14. **Severability; Discretion.** If any provision of this Agreement or the application hereof is held invalid or unenforceable, the remainder of this Agreement and the application hereof will not be affected thereby, the provisions of this Agreement being severable in any such instance. To the extent this Agreement grants any discretion to KEF in the exercise of KEF's rights, such discretion shall be absolute and unconditional.

15. **Power of Attorney.** Grantor hereby irrevocably makes and appoints KEF (and any person designated by KEF) as Grantor's true and lawful attorney with full power to: (a) sign Grantor's name on any form, title, document or instrument and make all necessary corrections thereto that KEF shall deem necessary or appropriate to perfect and maintain perfected the security interests in the Collateral (including correcting or inserting serial numbers, as needed); (b) make, settle and adjust claims under the Policies and endorse Grantor's name on any draft, instrument or other item of payment in respect of the Policies; (c) take control in any manner of any item of payment or proceeds of Collateral; and (d) prepare, file and sign Grantor's name on any proof of claim in bankruptcy or similar document against any obligor. The Power of Attorney granted by this section is coupled with an interest and is irrevocable so long as any Obligations remain outstanding.

16. **Governing Law; Jury Trial Waiver.** (a) THIS AGREEMENT IS BEING DELIVERED IN, AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF, THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAWS (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW). ANY ACTION BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING NON-CONTRACTUAL CLAIMS, SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT LOCATED IN THE STATE OF NEW YORK; PROVIDED, THAT AT KEF'S SOLE OPTION, KEF MAY BRING AN ACTION IN THE STATE WHERE GRANTOR OR THE COLLATERAL IS LOCATED. GRANTOR IRREVOCABLY WAIVES OBJECTIONS TO THE JURISDICTION OF SUCH COURTS AND WAIVES ANY ARGUMENT THAT VENUE IN ANY SUCH FORUM IS NOT CONVENIENT.

(b) GRANTOR HEREBY WAIVES GRANTOR'S RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO ANY COLLATERAL, THIS AGREEMENT OR EACH OTHER AGREEMENT. THIS WAIVER IS MADE KNOWINGLY, WILLINGLY AND VOLUNTARILY AND GRANTOR ACKNOWLEDGES THAT NO REPRESENTATIONS HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

17. **Other Provisions.** This Agreement shall be binding upon and inure to the benefit of KEF, Grantor and their respective heirs, personal representatives, successors and assigns. Grantor shall have no right to assign this Agreement or any Obligations without KEF's prior written consent. Grantor warrants and represents to, and covenants with KEF that: (a) no oral representations, agreements or understandings shall in any manner whatsoever modify or explain any of the terms and conditions herein; and (b) all such oral representations, agreements and understandings, if any, are hereby merged into this Agreement.

IN WITNESS WHEREOF, Grantor has executed this Agreement as of the 16th day of March, 2017.

**Company:**

**Albany CSD Solar 1 LLC**

By:

Name: Mark Fobare

Title: General Manager

Organization Type: Limited Liability Company
Jurisdiction of New York
Organizational No.: 61-1816402