UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

KEYBANK NATIONAL ASSOCIATION,

Plaintiff,

-against-

MONOLITH SOLAR ASSOCIATES LLC, et al.,

Defendants.

Case No. 1:19-cv-01562-DNH-ATB

## DECLARATION OF DANIEL SCOULER, RECEIVER, IN SUPPORT OF ORDER TO SHOW CAUSE WHY NON-PARTY GARY HICKOK SHOULD NOT BE FOUND IN CONTEMPT OF THE ORDER APPOINTING RECEIVER

DANIEL SCOULER declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am the Court-appointed Receiver in this action, and I submit this declaration in support of the application for an Order to Show Cause why non-party Gary Hickok should not be found in contempt of the Court's Order Appointing Receiver.

## BACKGROUND

2.      I was appointed Receiver pursuant to the Court's December 20, 2019 Order Appointing Receiver, as modified from time to time, and most recently by Second Order Modifying Receivership Order dated February 27, 2020 [Dkt. No. 96] (the "**Order Appointing Receiver**").[1]

3.      As stated in the Order Appointing Receiver, Monolith and the other Defendants were unable to pay their debts as they matured, and were, among other things, subject to creditor collection actions; and the appointment of a receiver was necessary, *inter alia*, to preserve and

---

[1]Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Order Appointing Receiver.

protect the Receivership Property during the pendency of the receivership (*see, e.g.* Order Appointing Receiver at p.4, ¶ H, I). Accordingly, the Receiver was "granted all powers necessary and usual in such cases for the protection, possession, control, management and operation of the Receivership Property," [*Id.*, p.6] and authorized to "take and have complete, immediate and exclusive control, physical possession and custody of the Receivership Property." [Id., ¶ 3].  In furtherance of the purpose of the receivership, the Order Appointing Receiver enjoined all creditors, parties in interest, and all other persons from taking any course of action that interferes with the Receiver's performance of his Court-ordered duties.. [*Id.*, ¶ 21].

4.     My primary objectives as Receiver are to protect, stabilize and maximize the value of the Business and Receivership Property.  In the event, as a result of these efforts, the Business and Receivership Property are eventually of sufficient value to provide a source of payment to unsecured creditors, a Court approved, orderly claims process could be implemented. As such it is critical that I have access to, operate and otherwise manage the Receivership Property without interference. [*See, id.*, ¶ 3].

5.     On December 9, 2016, prior to the commencement of this action, Defendant Monolith Solar Associates LLC entered into three Lease Agreements with Gary Hickok, d/b/a Gary's Garage to lease rooftop space at Mr. Hickok's business, Gary's Garage, located at 8A Apollo Drive, Albany, New York, for the installation and operation of certain solar electric power generating systems (each a "PV system").  A copy of one of the Lease Agreements is attached hereto as **Exhibit A** (the other Leases are identical).  Two of these systems were financed through sale leaseback transactions with Key Equipment Finance and the third system was financed through a loan from Capital Communications Federal Credit Union.

6.     The PV systems installed at Gary's Garage supply power to the Fire Companies of Malta ("**FCOM**"), pursuant to a March 17, 2015 Power Purchase Agreement between FCOM and Monolith. A copy of the Power Purchase Agreement is attached hereto as **Exhibit B**.

7.     Monolith entered into numerous similar lease arrangements with other property owners throughout upstate New York.  The Leases with Gary's Garage, as with most of Monolith's other leases, requires annual lease payments, payable on the anniversary of the "Commercial Operation" date, as defined in the Lease.  In the case of Gary's Garage, the annual rents for the three Leases were $896.66, $2,146.53 and $1,174.22, and the rental due dates are in June and July of each year.

8.     Prior to my appointment as Receiver, Monolith became delinquent on most of its roof-top and other leasing arrangements with property owners for the housing of PV systems, including Gary's Garage.  Upon information and belief, the aggregate pre-Receivership rent arrearage due Gary's Garage is $13,737.63.

9.     In order to preserve the status quo during the pendency of the Receivership, I notified Monolith's roof-top and other property lessors, including Gary's Garage, that I would require ongoing access to the leased premises, as provided for under the Leases and the Order Appointing Receiver, and would resume rent payments with the 2020 rent, payable in monthly installments beginning April 2020,  without waiver of any of the lessors' rights with respect to pre-Receivership defaults.  Almost all lessors have accepted this proposal.

10.     We learned in or about late March 2020 that Mr. Hickok had disconnected the PV systems at Gary's Garage.  We were able to contact Mr. Hickok's son, Patrick Hickok on or about April 1, 2020 to explain the Receivership and arrange for access to the Leased Premises in order to reconnect the systems, and to  arrange for the payment of post-receivership rent. Patrick Hickok

3

represented that he had authority to communicate with us on his father's behalf. Patrick Hickok refused to recognize my authority and advised us that we would not be permitted to access the Leased Premises until all of Monolith's pre-Receivership arrears to Gary's Garage were paid.[2]

11.    On April 3, 2020, my attorneys wrote to Mr. Hickok, explaining my authority under and the injunctive provisions of the Order Appointing Receiver, confirmed the proposal to pay rent without waiver of pre-Receivership defaults, and  provided Mr. Hickok with a copy of the Order Appointing Receiver.   Mr. Hickok did not respond to the April 3, 2020 letter.

12.    On May 12, 2020, my attorneys again wrote to Mr. Hickok, and advised Mr. Hickok he was in violation of the Order Appointing Receiver, demanded that he permit the Receiver access to the Leased Premises, and advised Mr. Hickok that unless he complied the letter within seven days, the Receiver would make an application to the Court to hold him in contempt. Again Mr. Hickok did not respond.

13.    Representatives of Monolith made subsequent unsuccessful efforts to contact Mr. Hickok by phone on May 26, 2020 and May 28, 2020.

14.    The Receivership estate has been, and continues to be, damaged by Mr. Hickok's refusal to abide by the Order Appointing Receiver.

15.    Under the Power Purchase Agreement with FCOM, Monolith is required to sell electricity to FCOM throughout the 20 year term of the Agreement (¶ 5); and Monolith is in default under the Agreement if the PV system is not operated for a period of 90 days (subject to certain notice provisions provided therein), and is subject to claims for damages (¶ 19).

---

[2]I did not accede to Mr. Hickok's demand for payment because the use of post-Receivership funds to pay the pre-Receivership arrears would undermine the purpose and viability of the Receivership, would deplete post-Receivership cash needed for ongoing, post-Receivership operations, would contravene the terms of the post-Receivership financing provided by KeyBank, and would be inherently unfair to the great number of other lessors and unsecured creditors with pre-Receivership claims.

16.     Moreover, as a result of Mr. Hickok's disconnecting the PV systems and refusal to reconnect them or allow us to reconnect them, the PV systems are not producing electricity, and the Receivership has been deprived of the revenue that would otherwise have been received from sales of electricity to FCOM.  Based on Monolith's records, the projected revenue from the PV systems located at Gary's Garage was approximately $17,000 over the past four months.

17.     This lack of revenue has in turn caused defaults in debt service and equipment payments to Key Equipment Finance and Capital Communications Federal Credit Union on their respective sale lease back and loans that financed the PV systems.

**RELIEF REQUESTED**

18.     By this Motion, and for the reasons set forth above, the Receiver seeks the entry of an Order holding Mr. Hickok in contempt of the Order Appointing Receiver.

19.     It is respectfully submitted that Mr. Hickok's refusal to allow the Receiver access to the leased premises and refusal to reconnect the PV system to the grid is a clear and intentional violation of the Order Appointing Receiver.

20.     For the reasons explained above, it is especially time sensitive that I be allowed access to the leased premises and that the PV system be reconnected to the power grid.

21.     Due to Mr. Hickok's deliberate and continuous contempt of the Court's explicit direction in the Order Appointing Receiver that no person shall interfere with the Receiver's duties thereunder, it is respectfully requested that the Court order Mr. Hickok to purge his contempt as follows:

      a.   Mr. Hickok should be required to reimburse the Receiver for his attorneys' fees and expenses for bringing this motion, the necessity of which was created by Mr.

5

Hickok's contempt, in such amount as the Court determines upon subsequent application setting forth the amount of such fees and costs.

b. Mr. Hickok should be required to pay a fine, payable to the Receiver, in an amount equal to the lost revenue resulting from Mr. Hickok disconnecting the PV systems, from April 1, 2020 (the approximate date we were first denied access to the leased premises) through the date the Receiver is able to reconnect the PV systems. Based on Monolith's records, lost revenues are approximately $4,250 per month, or $141.00 per day. The amount of lost revenue from April 1, 2020 through that date of this Declaration is approximately $9,729.00.

c. The Receiver should be permitted to apply to the Court for additional damages in the event, upon re-entry, it is determined that Mr. Hickok has removed or otherwise caused damage to the PV system.

d. Mr. Hickok should be required to pay a daily fine until such time as the Receiver has been given ongoing access to the Leased Premises and is able to reconnect the PV system to the grid. The daily fine should be in an amount determined by the Court to be sufficient to coerce Mr. Hickok's timely compliance.

22.    An Order to Show Cause, as opposed to ordinary motion practice, is appropriate in these circumstances because it is critical that the Receiver is able to access the leased premises and maintain and operate the PV systems as soon as possible so that the Receiver can resume the production and sale of electricity to FCOM and can resume lease and loan payments to its secured creditors with respect to the financed systems.

23.    I declare under penalty of perjury that the foregoing is true and correct.

      **WHEREFORE**, the Receiver respectfully requests that the Court grant the relief sought herein, along with such other and further relief as the Court deems just and proper.

Executed on June 8, 2020

By:    <u>s/Daniel Scouler</u>
        DANIEL SCOULER
        RECEIVER

# EXHIBIT A



**LEASE AGREEMENT**

This Lease Agreement (this "Lease") is made effective as of 12/09/2016, by and between Gary's Garage ("Lessor") with its principal office located at 8A Apollo Drive Albany NY 12205, and Monolith Solar Associates LLC ("Lessee") with its principal office located at 444 Washington Street, Rensselaer, NY 12144 to lease certain Premises. The parties agree as follows:

**PREMISES**. Lessor, in consideration of the lease payments provided in this Lease, agrees to lease to Lessee roof space (the "Premises") capable of supporting a 500,000-watt solar electric power generating system(s) (the "PV System") located at 8A Apollo Drive, 5 Apollo Drive, 9 Apollo Drive Albany NY 12205, 7 Norman Drive Albany NY 12205 (the "Property").

**TERM**. The Lease will begin on the date of its execution and expire twenty (20) years after Commercial Operation. Commercial Operation is the date upon which the PV System is granted permission to operate by the utility company. Lessor grants Lessee the right, privilege and option to extend the Lease for two (2) extension periods of five (5) years each, upon the same terms and conditions as contained in the Lease, with notice in writing to Lessor at least ninety (90) days prior to the expiration of the term or preceding extension of the term. Notwithstanding the foregoing, Lessee and Lessor acknowledge and agree that this Lease shall be coterminous with the term in a Power Purchase Agreement associated with the PV System.

**LEASE PAYMENTS**. Lessee shall pay to Lessor $4,500.00 per year, beginning upon Commercial Operation and then payable in advance annually on the anniversary date of Commercial Operation. Such lease payments shall increase yearly at a rate of 1.75%.

**SIGNING BONUS**. Lessor shall receive a signing bonus of $45,000.00 if signed by 12/12/2016, 2016. The signing bonus is fully earned and payable upon Commercial Operation of the PV System, subject to the contingencies below.

**POSSESSION**. Lessee shall be entitled to possession as of the date of execution of this Lease, and shall return possession to Lessor on the last day of the term of this Lease, unless otherwise agreed by both parties in writing. Lessee shall have the right to receive any security codes or access necessary to occupy the Premises as needed by the Lessee. At the end of the term, Lessee shall remove its property and return the Premises to Lessor in as good condition as when delivered to Lessee, ordinary wear and tear excepted.

**USE OF PREMISES**. Lessee shall have the right upon full execution of this Lease to develop, permit, store equipment for, construct, reconstruct, finance, install, maintain, repair, replace, decommission, use, own, and operate a PV System, including ingress to and egress from, all electrical collection, transmission and interconnection facilities, and access and service roads related to the PV System on the Premises and other improvements necessary for the generation, storage, selling, and delivery of electrical power from the Premises to the local electricity distribution system and/or the local electrical transmission system.

**CONTINGENCIES**. Lessee shall have an Inspection Period commencing on full execution and delivery of this Lease within which to perform due diligence, and to investigate, apply for, and pursue such permits

and approvals, in each and every case, as Lessee determines are necessary or desirable, in its sole and absolute discretion including, but not limited to, (i) municipal/governmental approval for installation of a roof mounted PV System on the Premises; and (ii) utility approval for interconnection within a reasonable cost to the Lessee, (iii) approval of financial incentives from the NY-Sun Incentive Program; and (iv) a structural analysis letter allowing the installation to proceed. Lessor agrees to execute any papers and documents reasonably necessary to complete contingencies as well as any papers necessary for third-party consents such as financing parties. Lessee has the right to cancel this Lease or reduce the lease payment amount or bonus amount based on the ability and availability to install a roof mounted PV System.

**LESSOR WARRANTIES**. Lessor warrants that Lessor is not in default under any mortgage and that there are no pending or threatened litigation relating to the ownership, use, or possession of the Property.

**INSURANCE**. At all times during the term of the Lease, Lessee shall maintain and pay for liability insurance covering certain risks arising directly or indirectly out of Lessee's activities on the Premises. Lessee shall maintain General Liability coverage of one million dollars ($1,000,000) for each occurrence, and two million dollars ($2,000,000) in the aggregate. Lessee shall maintain Umbrella Liability coverage of five million dollars ($5,000,000). Lessee shall also have Worker's Compensation Insurance for the entirety of all installation processes. Lessor shall maintain adequate casualty and general liability insurance coverage for the Property for the duration of the Lease.

**MAINTENANCE**. Lessor shall have the responsibility to maintain the Premises in good repair at all times and perform all repairs necessary except that Lessee shall be responsible for maintaining the PV System and addressing any roof related concerns as a result of the PV System. Lessee shall have access at any hour to clean, maintain, repair, or replace its equipment. Lessee shall make reasonable attempts to give notice to Lessor of its planned visit to the Premises.

**TAXES**. Lessee shall pay real and personal property taxes assessed or levied against the Premises as a result of the PV System during the term of the Lease.

**FORCE MAJEURE**. If the Premises are damaged or destroyed by fire or other casualty to the extent that the use is substantially impaired, Lessor, in its sole discretion may elect to repair the Premises or terminate the Lease upon thirty (30) days' written notice to Lessee. If the Premises are condemned or cannot be repaired or the PV System cannot be repaired, this Lease will terminate upon twenty (20) days' written notice by either party and Lease payment amounts will be prorated to the date of termination.

**DEFAULT BY LESSEE**. Lessee shall be in default of this Lease if Lessee fails to fulfill any lease obligation or term by which Lessee is bound. If Lessee fails to cure any financial obligation within thirty (30) days after written notice of such default is provided by Lessor to Lessee, Lessor may elect to cure such default and the cost of such action shall be added to Lessee's financial obligations under this Lease.

**INDEMNIFICATION**. Each party, its subsidiaries, affiliates, and assigns (the "Indemnifying Party") shall not be liable for any damage or injury to the other party, or any other person, or to any property, occurring on the Premises or any part thereof or as a result of possession or use of the Premises, or business operations on the Property, except to the extent caused by the gross negligence or willful misconduct of

the other party. The Indemnifying Party agrees to indemnify and hold the other party harmless from any and all damages, costs, liabilities, penalties, fines, forfeitures, demands, claims, causes of action, suits and costs and expenses incidental thereto, and all other losses, to the extent arising, directly or indirectly, in connection with the Indemnifying Party's use or possession of the Property or business operations on the Property. Said indemnification shall include indemnity from any costs or reasonable fees which the other party may incur in defending said claim.

**REMODELING OR STRUCTURAL IMPROVEMENTS.** Should Lessor require remodeling or structural improvements to the Premises that would affect the PV System, Lessor shall provide written notice to Lessee thirty (30) days in advance. Should Lessee have to remove the PV System, the fair market value for removal and reinstallation of the PV System shall be deducted from the lease payment due Lessor in the following year.

**NO INTERFERENCE.** Lessor shall not enter into any agreements, leases, lease renewals, easements, or any other arrangements for rights to or for the Property that could adversely affect the Premises, or the ownership, operation, or use of the PV System, or the transmission and interconnection facilities. Lessor's activities and any grant of rights by Lessor to any third party shall not, now or in the future, interfere with any rights granted to Lessee under this Lease. Without limiting the foregoing, Lessor shall not: (a) construct or permit to be constructed any structure; (b) plant or allow to be planted any trees or other vegetation; or (c) allow any other obstruction, in each case, on the Property or adjacent to the Premises, that is reasonably expected to decrease the output or efficiency of the PV System or adversely affect insolation. Lessor has no right or interest in or to the PV System or any appurtenances thereto. The PV System shall remain the sole personal property of the Lessee or its assigns. Lessor waives any rights or claims to a lien or other interest in the PV System. Lessor shall sign any consent acknowledging such.

**DANGEROUS MATERIALS.** Lessee shall not keep or have on the Premises any article or thing of a dangerous, flammable, or explosive character that might substantially increase the danger of fire on the Premises, or that might be considered hazardous by a responsible insurance company, unless the prior written consent of Lessor is obtained and proof of adequate insurance protection is provided by Lessee.

**ASSIGNABILITY/ SUBLETTING.** Lessee may sublet the Premises in whole or in part without Lessor's consent, but the making of any sublease shall not release Lessee from, or otherwise affect in any manner, any of Lessee's obligations under this Lease. Lessee may assign, collaterally assign, or transfer this Lease Agreement, or any interest in this Lease Agreement, whole or in part without Lessor's consent. This Lease shall inure to the benefit of and be binding upon Lessor and Lessee, their heirs, successors and assigns (including each Assignee). Lessor agrees that the rights of Lessee under this Lease shall extend to agents, representatives, employees, contractors, subcontractors and other service providers of Lessee

**CHANGE IN LAW OR CIRCUMSTANCE.** If there is a change in law or circumstance that occurs that will affect the operation of a PV System, Lessee shall be responsible for dealing with reasonable increases in costs or remediation as required. If such change in law makes operation of a PV System impossible or impracticable, Lessee may terminate this Lease. Upon notice of termination, Lessee shall have twelve (12) months to remove the system from the Premises.

**GOVERNING LAW**. This Lease will be construed in accordance with the laws of the State of New York.

**NOTICE**. Notices under this Lease shall be deemed invalid unless given or served in writing and forwarded by mail, postage prepaid, addressed to the party at the appropriate address set forth below. Such addresses may be changed from time to time by either party by providing notice as set forth below. Notices mailed in accordance with these provisions shall be deemed received on the third day after posting.

**LESSOR:**

Gary's Garage
Attn: Gary Hickok
8A Apollo Drive
Albany NY 12205

**LESSEE:**

Monolith Solar Associates LLC
Attn: Steven Erby
444 Washington Street
Rensselaer, NY 12144

**ENTIRE AGREEMENT/AMENDMENT**. This Lease supersedes all other previous agreements regarding the roof of the Premises. This Lease contains the entire agreement of the parties and there are no other promises, conditions, understandings or other agreements, whether oral or written, relating to the subject matter of this Lease. This Lease may be modified or amended in a writing signed by both parties.

**SEVERABILITY**. If any portion of this Lease shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Lease is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**WAIVER**. The failure of either party to enforce any provisions of this Lease shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Lease.

**BINDING EFFECT**. The provisions of this Lease shall be binding upon and inure to the benefit of both parties and their respective legal representatives, successors and assigns.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Lease the date first above stated.

**LESSOR:**

Enter Lessor Business Name

by: Gary Hickok

Owner
Title

**LESSEE:**

**Monolith Solar Associates LLC**

by: Steven Erby

COO
Title

_12/9/16_
Date

_12/9/2016_
Date

# EXHIBIT B



**POWER PURCHASE AGREEMENT
REMOTE NET METERING**

Dated as of

**March 17th, 2015**


between

# FCOM

**( Off-Taker )**


and


**Monolith Solar Associates, LLC**


*Referred by: _____*

# POWER PURCHASE AGREEMENT

This Power Purchase Agreement ("**Agreement**") is entered into as of March, 17th, 2015 by and between Monolith Solar Associates, a New York limited liability company ("**Provider**"), and FCOM ("**Off-Taker**").

WHEREAS, Provider is the owner or leaseholder of the Property as detailed in Exhibit A and desires to lease a portion of such Property to Off-Taker for the construction, operation and maintenance of a solar photovoltaic electric generating project.

WHEREAS, Off-Taker shall purchase from Provider the electricity produced by the project.

WHEREAS, Provider desires to develop, design, construct, own and operate the project..

NOW, THEREFORE, in consideration of the premises, the covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

1.      **DEFINITIONS**.

"Ancillary Services" as applied to any additional programs, services, subsidies or incentives directly enabled by the potential or actual production of Electricity or reduction of demand directly attributable to the installed PV System's potential or operation. Ancillary services provide the Utility System operator with the resources needed to maintain the instantaneous and continuous balance between generation and load, to manage transmission line flows, and to implement the control schemes to ensure the supply and quality transmission of power.

"Applicable Law" means any constitutional provision, law, statute, rule, regulation, ordinance, treaty, order, decree, judgment, decision, certificate, holding, injunction, registration, license, franchise, permit, authorization, guideline, Governmental Approval, consent or requirement of any Governmental Authority having jurisdiction over the Parties or their property, enforceable at law or in equity.

"Electric Service Provider" means any person, including the Local Electric Utility, authorized by the State of New York to provide electric energy and related services to retail users of electricity in the area in which the Site is located.

"Electricity" means all usable electric energy and power, measured in kilowatt-hours ("kWh") and kilowatts ("kW"), generated by the project and delivered to the Off-Taker at the point of connection, and metered by an electric meter approved by the New York State Public Service Commission in accordance with Public Service Law § 67, owned and installed by Provider.

"Environmental Attributes" means Renewable Energy Certificates, carbon trading credits, emissions reductions credits, emissions allowances, green tags, Green-e certifications, or other entitlements, certificates, products, or valuations attributed to the Project and its displacement of conventional energy generation, or any other entitlement pursuant to any federal, state, or local program applicable to renewable energy sources, whether legislative or regulatory in origin, as amended from time to time, and excluding, for the avoidance of doubt, any Tax Attributes and the Applicable Solar Program.

"Equipment" means a photovoltaic system  that is manufactured, installed, and operated in accordance with applicable government and industry standards, that is connected to the electric system and operated in conjunction with an electric corporation's transmission and distribution facilities, and that is operated in compliance with any standards and requirements established under Section 66-j of the New York Public Service Law.

"Financing Party" means a Project Lessor or Lender.

"Installer" means the person designated by Provider to install the Project.

"Local Electric Utility" means the local electric distribution owner and operator providing electric distribution and if required, interconnection services to Off-Taker.

"Operations Period" means the period of time the Project is in operation, commencing from the Commercial Operations Date.

"Parties" means both the Off-Taker and Provider.

"Party" means either Off-Taker or Provider, as applicable.

"Point of Delivery" means the point of interconnection to Local Electric Utility meter at Host Site.

"Project" means the process, including the integrated system for the generation of Electricity from solar energy consisting of the Equipment and associated equipment installed by Provider in accordance with this Agreement, as well as all other activity associated with the construction, operation and maintenance of Equipment, all interparty activity required to construct such Project.

"Satellite Site" is the location corresponding to the Off-taker's Satellite Utility Account(s).

"Site" is the real property which the Project will be located.

"Tax Attributes" means the investment tax credits including any grants or payments in lieu thereof and any tax deductions or other benefits under the Internal Revenue Code or applicable federal, state, or local law available as a result of the ownership and operation of the Project or the output generated by the Project,including, without limitation, tax credits, including any grants or payments in lieu thereof, and accelerated and/or bonus depreciation.

2.     **TERM**.

(a)     This Agreement shall consist of an Initial Period and an Operations Date.

(b)     Initial Period. The Initial Period will begin on the date set forth above and will terminate on the Operation Date or the date the Agreement is terminated.

(c)     Operations Date. The Operation Date means the date, which shall be specified by Provider to Off-Taker when the Project is physically complete and has successfully completed all performance tests and satisfies the interconnection requirements of the Local Electric Utility. The term of this Agreement, as to the Project designated, shall commence on the Operation Date for the Project, and shall continue for **twenty (20) years**.

**(d)**     Any notice of termination given by either party under this Agreement or under any **Supplement annex**ed hereto may not be revoked without the written consent of the other party.

3.     **PLANNING, INSTALLATION AND OPERATION OF PROJECT.**

(a)     Site Assessment and Planning. During the Initial Period, Provider shall have the right, at its own expense to arrange interconnections with the Local Electric Utility; to make any applications to the appropriate Public Utilities Commission or other agencies for receipt of payments for the Project under the Applicable Solar Program; to apply to any other governmental agencies or other persons for grants or other determinations necessary for the construction of or receipt of revenues from the Project; or to make any other investigation or determination necessary for the financing, construction, operation or maintenance of the Project.

(b)     Termination of Development Activities. At any time during the Initial Period, Provider shall have the right to cease development of the Project on the Site, for any reason, in its sole discretion.  If Provider gives Off-Taker notice of such determination, this Agreement shall terminate effective as of the delivery of such notice without any further liability of the Parties to each other, provided that (i) the Parties shall not be released from any payment or other obligations arising under this Agreement prior to the delivery of the notice; and (iv) the confidentiality provisions, the indemnity obligations hereof, and the dispute resolution provisions hereof shall continue to apply notwithstanding the termination of this Agreement.

(c)     Commencement of Construction, Modification of Design. At any time during the Initial Period, upon at least ten (10) Business Days' notice to Off-Taker, Provider shall have the right to commence construction of the Project.

(i)     As of the date hereof, Provider anticipates that the Project shall consist of the components and shall have the designs set forth in Exhibit A attached hereto.

(ii)     Notwithstanding subsection (i) above, Provider has the right to modify the design of the Project, including the selection of the components in the Project, as Provider, in its sole discretion, may determine, provided, however, that such changes shall not result in the Project exceeding the nameplate capacity set forth in Exhibit A, without Off-Taker's approval.

(d)    <u>Contractors.</u> Provider shall use contractors to perform the work of installing, operating, and maintaining the Project.  Provider intends to use Installer to perform such work, but may use other contractors, for all or a portion of such work.  Provider shall advise Off-Taker of the Installer prior to commencement of the work.

(e)    <u>Status Reports.</u> Provider shall give Off-Taker regular updates, on a reasonable schedule, on the progress of installation of the Project and shall notify Off-Taker when Provider will commence testing of the Project, when the Project    is capable of producing electricity on a continuous basis, Provider shall notify Off-Taker that installation of the Project is complete and has been provided Permission To Operate ("PTO") and shall specify the Commercial Operation Date for the Project, which may be immediately upon delivery of such notice to Off-Taker.

(f)    <u>Standard of Operation.</u> Provider shall design, obtain permits, install, operate, and maintain the Project so as to keep it in good condition and repair, in compliance with all applicable laws and in accordance with the generally accepted practices of the electric industry, in general, and the solar generation industry, in particular.  Such work shall be at Provider's sole expense..

(g)    <u>Maintenance and Repairs.</u>

Provider will at all times keep the Project in its sole possession and control.
(i)    Provider shall, during the term of this Agreement, at its expense, keep the Project in good working order and condition and make all necessary adjustments, repairs and replacements thereto.

(ii)    Off-Taker and Provider shall comply with all governmental laws, regulations and requirements, and all insurance requirements, if any, with respect to the use, maintenance and operation of the Project.

(h)    <u>Warranties.</u>

(i) As Project is under sole ownership of Provider, all work and maintenance is the responsibility of Provider for the full term of the Agreement.

(j)    <u>System Shut Down.</u> Provider may shut down the Project at any time in order to perform required emergency repairs to the Project.  At other times, Provider shall give Off-Taker notice of the shutdown as may be reasonable in the circumstances.  Provider shall not have any obligation to reimburse Off-Taker for costs of purchasing electricity that would have been produced by the Project but for such shutdown.

5.    **SALE OF ELECTRIC ENERGY**.

(a)    <u>Sale of Electricity.</u> Throughout the Operations Period, subject to the terms and conditions of this Agreement, Provider shall sell to Off-Taker and Off-Taker shall buy from Provider all electricity produced by the Project. Off-Taker shall only be responsible to pay for the electricity generated by the system. Title to and risk of loss with respect to the electricity shall transfer from Provider to Off-Taker at the Point of Delivery to the Utility Network.

(b)    <u>Delivery of Electricity.</u> The Electricity from the Project shall be delivered to the Utility Network from Provider and remotely applied to Off-Taker Account(s) by the Utility.
(c)    <u>Production Guarantee.</u>  For production guarantee see Exhibit C.

(d)    <u>Meter Testing.</u> Provider shall install one or more meter(s) at the Project, as Provider deems appropriate, to measure the output of the Project at the Point of Delivery.  Provider will measure the actual amount of Electricity delivered to the Utility Network for the benefit of the Off-Taker by the Project. Provider shall conduct tests of the meters at such times as it deems appropriate in accordance with industry standards.

6.    **PAYMENT AND BILLING**.

(a)    <u>Rates.</u> Off-Taker shall pay Provider for electricity produced by the Project at the rates set forth in Exhibit
<u>B</u> attached hereto.

(b)    All NYSERDA incentives remain property of Provider and are passed through to Off-Taker as a discount
in billable rates as detailed in <u>Exhibit B</u>.

(c)     Billing. Off-Taker shall pay for the electricity generated by the Project quarterly.  At the end of each billing cycle, Provider shall provide Off-Taker with an invoice setting forth the quantity of electricity produced by the Project in such billing cycle, the applicable rates for such, and the total amount due, which shall be the product of the quantities and the applicable rates.

(d)     Invoice Delivery. Invoices shall be in writing and shall be either (i) delivered by hand; (ii) mailed; (iii) transmitted by facsimile; or (iv) transmitted by email.

(e)     Payment. Off-Taker shall pay each invoice within thirty (30) days of receipt of the invoice. Payments shall be made by mail in the invoice or in a written notice delivered to Off-Taker.  Any amounts not paid when due, including any amounts properly disputed and later determined to be owing, shall be subject to a 1.5% late payment charge per month.

## 7.     SUPPLEMENTAL POWER, AND NET METERING.

(a)     Back-up and Supplemental Electricity. Except as otherwise provided herein, throughout the Term, Off-Taker shall be responsible for obtaining all of its requirements for electricity in excess of the amounts produced by the Project and pay for such service pursuant to contracts with or applicable tariffs of the Local Electric Utility or other Electric Service Provider.  Provider shall have no obligation to obtain or pay for such supplemental or back-up electricity.

(b)     Net Metering & Utility Credits. At any time that electric production from the Project is greater than Off-Taker's requirements at such time, Off-Taker shall nevertheless pay Provider for all of the electricity produced by the Project at the rates and in the manner provided in this Agreement.  Any power in excess of Off-Taker's requirements will be delivered to the Local Electric Utility through the Point of Delivery and Off-Taker shall receive any credits or payments from the Local Electric Utility under net metering.

(c)     Interconnection. Provider shall be responsible for arranging the interconnection of the Project with Off-Taker's Local Electric Utility in a manner which includes bi-directional or "net metering".  Off-Taker shall deliver to Provider a Letter of Authorization addressed to the Local Electric Utility to allow Provider to execute all necessary paperwork on Off-Taker's behalf.

(d)     Applicable Solar Program Incentives. Provider shall receive all payments available under any Applicable Solar Program. Off-Taker shall provide reasonable assistance to Provider in preparing all applications and other documents necessary for Provider to receive such payments, including designating Provider as the customer for purposes of the Applicable Solar Program or assigning payments from the Applicable Solar Program to Provider. If Off-Taker receives any payments under the Applicable Solar Program or other programs in respect of the Project, it shall promptly pay them over to Provider.

(e)     Ownership of Tax Attributes. Provider shall be the owner of any Tax Attributes that may arise as a result of the operation of the Project and shall be entitled to transfer such Tax Attributes to any entity or institution. Off-Taker shall provide reasonable assistance to Provider in preparing all documents necessary for Provider to receive such Tax Attributes, and if Off-Taker is deemed to be the owner of any such Tax Attributes, Off-Taker shall assign the same (or the proceeds thereof) to Provider.

(f)     Environmental Attributes.   Provider shall be the owner of any Environmental Attributes which may arise as a result of the operation of the Project and shall be entitled to transfer such Environmental Attributes to any entity or institution.  Off-Taker shall provide reasonable assistance to Provider in preparing all documents necessary for Provider to receive such Environmental Attributes, and if Off-Taker is deemed to be the owner of any such Environmental Attributes, Off-Taker shall assign the same (or the proceeds thereof) to Provider.

(g)     Capacity & Ancillary Services. Provider shall be entitled to receive any payments for electric capacity or ancillary services that may become available as a result of the construction or operation of the Project. Off-Taker shall provide reasonable assistance to Provider in preparing all documents necessary for Provider to receive such payments, and if Off-Taker is deemed to be the owner or provider of such capacity or services, Off-Taker shall assign the same to Provider.

(h)     No Resale of Electricity. The electricity purchased by Off-Taker from Provider under this Agreement shall not be resold, assigned or otherwise transferred to any other person without prior approval of the Provider, which approval shall not be unreasonably withheld, and Off-Taker shall not take any action which would cause Off-Taker or Provider to become a utility or public service company.

     (i)    <u>Provider Is Not A Utility.</u> Neither Party shall assert that Provider is an electric utility, public service company or electric corporation as defined in New York Public Service Law § 2, or any similar entity that has a duty to provide service, is subject to rate regulation as a result of Provider's obligations or performance under this Agreement.

## 8.     PERMITS, OWNERSHIP OF PROJECT, LIENS, MORTGAGES

     (a)    <u>Permits.</u> Provider shall pay for and obtain all approvals from governmental entities necessary for the construction and operation of the Project, including land use permits, building permits, demolition and waste disposal permits and approval.

     (b)    <u>System Ownership.</u> Provider shall be the legal and beneficial owner of the Project at all times. The Project shall at all times retain the legal status of personal property as defined under Article 9 of the Uniform Commercial Code.

## 9.     END OF TERM OPTION TO EXTEND.

     (a)    <u>Option to Extend</u>. Off-Taker shall have the option to extend the current Agreement for an additional five (5) or ten (10) year term. This option may be executed at the end of each new term for the useful life of the Project. Provider shall have the right to terminate Project Agreement at end of original term, or any extended term.

## 10.     SHUTDOWNS, RELOCATION; CLOSURE OR SALE OF SITE.

     (b)    <u>Provider Safety Shutdown</u>.  In addition to the right of Provider to shut down the Project for maintenance, Provider may shutdown the Project if Provider, in the exercise of reasonable judgment, believes Site conditions or activities of persons on a Site, which are not under the control of Provider, may interfere with the safe operation of the Project.  Provider shall give Off-Taker notice of a shutdown immediately upon becoming aware of the potential for such conditions or activities.

     (e)    <u>Satellite Site Shutdown; Deactivation</u>.  In the event Satellite Site is closed as a result of an event that is not (i) a Force Majeure Event or (ii) caused by or related to any unexcused action or inaction of Provider, Off-Taker shall nevertheless continue to pay Provider for all electricity produced by the Project and delivered to the Point of Delivery.  If an interconnection with the Local Electric Utility becomes deactivated for reasons that are not (i) a Force Majeure Event or (ii) caused by or related to any unexcused action or inaction of Provider such that transfer of electricity credits is no longer able to be delivered to the Satellite Site, Off-Taker will pay Provider an amount equal to the sum of (A) payments that Off-Taker would have made to Provider hereunder for electricity that would have been produced by the Project following such closure; (B) revenues that Provider would have received with respect to the Project under the Applicable Solar Program and any other assistance program with respect to electricity that would have been produced following such closure.

     (f)    <u>Relocation or Sale of Satellite Site</u>.  In the event Off-Taker ceases to conduct business operations at the Satellite Site, or otherwise vacates the Satellite Site prior to the expiration of the Term, Off-taker shall have the option to provide Provider with a mutually agreeable substitute Satellite Site located within the same load zone as the former Satellite Site.  If Off-taker transfers the Satellite Site to a transferee, and no Off-Taker Event of Default has occurred and is continuing, the Provider in its sole discretion may execute agreements whereby the transferee shall assume this Agreement in form and substance satisfactory to Provider in its sole discretion, such that Off-Taker may be released from further obligations under this Agreement.

## 11.     TAXES.

     (a)    <u>Income Taxes.</u> Provider shall be responsible for any and all income taxes associated with payments from Off-Taker to Provider for electricity from the Project.  Provider, as owner of the Project, shall be entitled to all Tax Attributes with respect to the Project.

     (b)    <u>Sales Taxes.</u> Off-Taker shall be responsible for all taxes, fees, and charges, including sales, use, and gross receipts taxes, imposed or authorized by any Governmental Authority on the sale of electric energy by

Provider to Off-Taker.  Off-Taker shall timely report, make filings for, and pay any and all such taxes assessed directly against it and shall reimburse Provider for any and all such taxes assessed against and paid by Provider.

       (c)     <u>Property Taxes.</u> Provider shall be responsible for all ad valorem personal property or real property taxes levied against the Site, improvements thereto and personal property located thereon, except that Provider shall be responsible for ad valorem personal property or real property taxes levied against the Project.

**13.**     **COOPERATION.**

       (a)     <u>Cooperation.</u> The Parties acknowledge that the performance of each Party's obligations under this Agreement will frequently require the assistance and cooperation of the other Party.  Each Party therefore agrees, in addition to those provisions in this Agreement specifically providing for assistance from one Party to the other, that it will at all times during the Term cooperate with the other Party and provide all reasonable assistance to the other Party to help the other Party perform its obligations hereunder.

**14.**     **PRESS RELEASES, MEDIA AND CONFIDENTIALITY**.

       (a)     <u>Press Releases.</u> The Parties acknowledge that they each desire to publicize information about this Agreement and the Project.  The Parties therefore agree that each may make independent press releases about entering into this Agreement, the size and location of the Project, and the identity of the other Party, without the prior written consent of the other Party, so long as only Provider has the exclusive right to (i) claim that electric energy provided to Off-Taker was generated by the Project, (ii) Provider is responsible for the reductions in emissions of pollution and greenhouse gases resulting from the generation of such electric energy and (iii) Provider is entitled to all credits, certificates, registrations, etc., evidencing or representing any of the foregoing except as otherwise expressly provided in this Agreement.   However, the terms of this Agreement and information about the Project other than that described above constitutes Confidential Information, as defined below, and is subject to the remaining provisions of this Section.

       (a)     <u>Photograph Release and Website Linking</u>. Off-Taker agrees to allow Provider to use Off-Taker's logo, Project and location via video or photographic medium for use in advertising, press releases, websites or any other form of media before, during, and after installation of the Project. Once Provider has added Off-Taker's Project to Provider's website gallery, Off-Taker has the option to add a link on their website to Provider's website and in turn Provider will also add a link to their website.

       (c)     <u>Confidential Information</u> means information of a confidential or proprietary nature, whether or not specifically marked as confidential.  Such information shall include, but not be limited to, any documentation, records, listing, notes, data, computer disks, files or records, memoranda, designs, financial models, accounts, reference materials, trade-secrets, prices, strategic partners, marketing plans, strategic or other plans, financial analyses, customer names or lists, project opportunities and the like, provided however that Confidential Information does not include information which (i) was in the possession of the receiving Party before receipt from the disclosing Party; (ii) is or becomes publicly available other than as a result of unauthorized disclosure by the receiving Party; (iii) is received by the receiving Party from a third party not known by the receiving Party with the exercise of reasonable diligence to be under an obligation of confidentiality respecting the information; or (iv) is independently developed by the receiving Party without reference to information provided by the disclosing Party.

       (d)     <u>Limits on Disclosure of Confidential Information.</u> Subject to the exceptions set forth below, each Party agrees that, (i) without the consent of the other Party, it shall not disclose any Confidential Information received from the other Party to any other person and (ii) it shall use any Confidential Information received from the other Party only for the purpose of fulfilling its obligations under this Agreement.  Notwithstanding the foregoing, the Parties may, and shall, disclose any information required to be disclosed under rules, regulations and contracts implementing the Applicable Solar Program or Tax Attributes required to be disclosed by any Governmental Authority under Applicable Law or pursuant to a validly issued subpoena or required filing.

       (e)     <u>Permissible Disclosures.</u> If a receiving Party is required by Applicable Law, validly issued subpoena, required filing, or the rules of any stock exchange, to disclose any Confidential Information provided by the disclosing Party, the receiving Party may make disclosure as required by law, but the receiving Party shall prior to making any disclosure notify the disclosing Party of the requested disclosure and shall use its reasonable efforts to cooperate with the disclosing Party, but at the expense of the disclosing Party, in any efforts by the disclosing Party to minimize the extent of the Confidential Information disclosed and the persons to whom disclosed.

(f)      Enforcement of Confidentiality Provisions. Each Party acknowledges that it may be impossible to measure the damages which may result from a breach of this Section and agrees that the provisions of this Section may be required to be specifically performed and each Party shall have the right to obtain preliminary and permanent injunctive relief to secure specific performance of the terms of this Section. The provisions of this Section shall survive until three years after the effective date of any termination of this Agreement.

15.     **INDEMNIFICATION**.

## TO BE REVIEWED BY ATTORNEY UNDER LEASE CONDITIONS!!

(a)      Provider Indemnification. Provider shall indemnify, defend and hold Off-Taker and its directors, officers, employees, agents, volunteers, and invitees ("Off-Taker's Indemnified Parties"), harmless from and against all Losses incurred by the Off-Taker Indemnified Parties to the extent arising from or out of the following: (i) any claim for or arising out of any injury to or death of any Person or loss or damage to property to the extent arising out of Provider's (or its contractor's) negligence or willful misconduct; (ii) Provider's violation of Applicable Law; (iii) any failure to properly interconnect or comply with the procedures of the Local Electric Utility; or (iv) any failure to properly handle or dispose of any Hazardous Materials brought onto the Site by Provider or by any of Provider's employees, agents, volunteers, and invitees.  Such duty to indemnify shall not apply to any action or claim, whether in tort (including negligence and strict liability), contract or otherwise for any loss, injury, or costs resulting from interruptions in service.  Provider shall not be obligated to indemnify Off-Taker or any Off-Taker Indemnified Party for any Loss to the extent such Loss is due to the negligence or willful misconduct of Off-Taker or any Off-Taker Indemnified Party.

(b)      Off-Taker Indemnification. Off-Taker shall indemnify, defend and hold Provider, its contractors, subcontractors, shareholders, directors, officers, employees, agents, and invitees ("Provider's Indemnified Parties"), harmless from and against all Losses incurred by the Provider's Indemnified Parties to the extent arising from or out of (i) any claim for or injury to or death of any Person or loss or damage to property to the extent arising out of the negligence or willful misconduct of any of Off-Taker's Indemnified Parties; (ii) Off-Taker's violation of Applicable Law. Off-Taker shall not be obligated to indemnify Provider or any Provider Indemnified Party for any Loss to the extent such Loss is due to the negligence or willful misconduct of Provider or any Provider Indemnified Party.

(c)      Notice of Claims. Whenever any claim arises for indemnification under this Agreement, the Indemnified Person shall notify the Indemnifying Party in writing as soon as possible (but in any event prior to the time by which the interest of the Indemnifying Party will be materially prejudiced as a result of its failure to have received such notice) after the Indemnified Person has knowledge of the facts constituting the basis for such claim (the "Notice of Claim").  Such Notice of Claim shall specify all facts known to the Indemnified Person giving rise to the indemnification right and the amount or an assessment of the amount of the liability arising therefrom.

(d)      Defense of Claims. The Indemnifying Party has the right, but not the obligation to assume the defense or the matter for which indemnification is sought hereunder.  If the Indemnifying Party does not assume the defense, it shall timely pay all costs of counsel and case expenses incurred by Indemnified Person in connection with the defense, when and as incurred.  If the Indemnifying Party assumes the defense, the Indemnified Person has the right to hire its own counsel to defend it, but the Indemnified Person shall be responsible for the reasonable costs of such counsel.  The Indemnifying Party shall not consent to the entry of any judgment or enter into any settlement with respect to the matter for which indemnification is sought without the prior written consent of the Indemnified Person (which consent shall not be unreasonably withheld) unless the judgment or settlement involves the payment of money damages only and does not require the acknowledgement of the validity of any claim.

(e)      Payments. At the time that the Indemnifying Party makes any indemnity payments under this Agreement, the indemnification payment shall be adjusted such that the payment will result in the Indemnified Person receiving an indemnity payment equal to the Loss after taking into account (i) all federal, state, and local income taxes that are actually payable to the Indemnified Person with respect to the receipt of such payment and (ii) all national, state, and local tax deductions allowable to the Indemnified Person for any items of loss and deduction for which the Indemnified Party is being indemnified.

(f)      Survival of Indemnification. The obligations of indemnification hereunder shall survive termination of this Agreement.

16.     **REPRESENTATIONS AND WARRANTIES**.

(a)      Mutual Representations. Each Party hereby represents and warrants to the other, as of date hereof, that:

(i)      Organization.  It is duly organized, validly existing and in good standing under the laws of its state of incorporation and of the state in which the Satellite Site and Site are located, respectively, and has the power and authority to enter into this Agreement and to perform its obligations hereunder.

(ii)      No Conflict.  The execution and delivery of this Agreement and the performance of and compliance with the provisions of this Agreement will not conflict with or constitute a breach of or a default under (1) its organizational documents; (2) any agreement or other obligation by which it is bound; (3) any law or regulation.

(iii)      Enforceability.  (1) All actions required to be taken by or on the part of such Party necessary to make this Agreement effective have been duly and validly taken; (2) this Agreement has been duly and validly authorized, executed and delivered on behalf of such Party; and (3) this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable in accordance with its terms, subject to laws of bankruptcy, insolvency, reorganization, moratorium or other similar laws.

(iv)      No Material Litigation.  There are no court orders, actions, suits or proceedings at law or in equity by or before any governmental authority, arbitral tribunal or other body, or threatened against or affecting it or brought or asserted by it in any court or before any arbitrator of any kind or before or by any governmental authority that could reasonably be expected to have a material adverse effect on it or its ability to perform its obligations under this Agreement, or the validity or enforceability of this Agreement.

(b)      Off-Taker Representations.  In addition to the representations and warranties in Section 16(a), Off-Taker hereby represents and warrants to Provider, as of date hereof, that:

(i)      Electric Usage.  Off-Taker has provided to Provider complete and correct records of its electric usage at the Satellite Site for the preceding one (1) year.

## 17.      FORCE MAJEURE.

(a)      A Force Majeure Event means any act or event that prevents the affected Party from performing it obligations in accordance with this Agreement, if such act or event is beyond the reasonable control, and not the result of the fault or negligence, of the affected Party and such Party had been unable to overcome such act or event with the exercise of due diligence (including the expenditure of reasonable sums).  Subject to the foregoing, Force Majeure Event may include but are not limited to the following acts or events: (i) natural phenomena, such as storms, hurricanes, floods, lightning and earthquakes; (ii) explosions or fires arising from lightning or other causes unrelated to the acts or omissions of the Party seeking to be excused from performance; (iii) acts of war or public disorders, civil disturbances, riots, insurrection, sabotage, epidemic, terrorist acts, or rebellion; and (iv) strikes or labor disputes. Force Majeure Events shall not include equipment failures or acts or omissions of agents, suppliers or subcontractors, except to the extent such acts or omissions arise from a Force Majeure Event.  Changes in prices for electricity shall not constitute Force Majeure Events.

(b)      Excuse for Force Majeure Event. Except as specifically provided in this Agreement, neither Party shall be considered in breach of this Agreement or liable for any delay or failure to comply with this Agreement, if and to the extent that such delay or failure is attributable to the occurrence of a Force Majeure Event; provided that the Party claiming relief as a result of the Force Majeure Event shall promptly (i) notify the other Party in writing of the existence and details of the Force Majeure Event; (ii) exercise all reasonable efforts to minimize delay caused by such Force Majeure Event; (iii) notify the other Party in writing of the cessation of such Force Majeure Event; and (iv) resume performance of its obligations hereunder as soon as practicable thereafter.

(c)      No Excuse for Payment for Prior Services. Obligations to make payments for services already provided shall not be excused by a Force Majeure Event.

(d)      Restoration. In the event of a casualty event, to the extent that such casualty event is attributable to the occurrence of a Force Majeure Event, which destroys all or a substantial portion of the Site, Provider shall elect, within ninety (90) days of such event, whether it will restore the Site, which restoration will be at the sole expense of Provider. If Provider does elect to restore the Site and Project, Off-Taker shall be provided notice within ninety (90) days of original Force Majeure event. A reasonable schedule of Restoration of the Project shall be provided. Said Restoration will be complete within two hundred and seventy (270) days of original event. Term of Agreement will be extended by a period equal to the Restoration period. If Provider does not elect to restore the Site and Project, this Agreement will terminate.  In the event of termination of this Agreement pursuant to this Section, (i) the Parties shall not be released from any payment or other obligations arising under this Agreement prior to the casualty event; and

(ii) the confidentiality provisions, the indemnity obligations hereof, and the dispute resolution provisions hereof shall continue to apply notwithstanding the termination of this Agreement.

(e)     Termination for Force Majeure Event. Notwithstanding anything to the contrary in this Section, if nonperformance on account of a Force Majeure Event continues beyond a continuous period of three hundred and sixty-five (365) days, then either Party shall have the right to terminate this Agreement upon thirty (30) days notice to the other. In the event of such a termination of this Agreement with respect to the Project, the Parties shall not be released from any payment or other obligation arising under this Agreement which accrued prior to the shutdown of the Project or the Satellite Site, and the indemnity, confidentiality and dispute resolution provisions of this Agreement shall survive the termination of this Agreement.

18.     **CHANGE IN LAW** OR POLICY

In the event there is a Change in Law or Policy that is applicable to the operation of the Project, the sale of electricity produced by the Project, or any other obligation of the Provider hereunder, and compliance with the Change  results in an increase in Provider's costs to operate and/or maintain the Project,  Provider will promptly submit to Off-Taker a written notice setting forth (i) the applicable Change in Law or Policy; (ii) the manner in which such Change in Law or Policy increases Provider's costs; and (iii) Provider's options to remedy to the then applicable and future rates for electricity in this Agreement to reflect such increases in costs. Options to remedy shall include (i) a new negotiated rate, or (ii) a continuation of the current Agreement, or (iii) at option of Provider, a termination of Agreement.

19.     **PROVIDER DEFAULT AND OFF-TAKER REMEDIES**.

(a)     Provider Events of Default.  Provider shall be in default of this Agreement if any of the following ("Provider Events of Default") shall occur:

(i)     Misrepresentation. Any representation or warranty by Provider under Section 16 hereof, is incorrect or incomplete in any material way, or omits to include any information necessary to make such representation or warranty not materially misleading, and such defect is not cured within thirty (30) days after receipt of notice from Off-Taker identifying the defect.

(iii)     Failure to Operate. After the Commercial Operation Date, Project fails to generate electricity for a period of 90 days which failure is not due to equipment failure, or damage to the Project, act of governmental authority, or exercise of Provider's rights under this Agreement, or otherwise excused by the Force Majeure Events; and Provider fails to resume operation within thirty (30) days after receipt of notice from Off-Taker stating that, in Off-Taker's reasonable determination, Provider has ceased operation of the Project, provided, however, that the cure period shall be extended by the number of calendar days during which Provider is prevented from taking curative action if Provider had begun curative action and was proceeding diligently, using commercially reasonable efforts, to complete such curative action.

(b)     Off-Taker Remedies. Upon an Event of Default by Provider, provided that Off-Taker complies with its obligations and does not cure such Event of Default by Provider, Off-Taker may terminate this Agreement, seek to recover damages for costs of replacement electricity and pursue other remedies available at law or equity.

20.     **OFF-TAKER DEFAULT AND PROVIDER REMEDIES**.

(a)     Off-Taker Events of Default.  Off-Taker shall be in default of this Agreement if any of the following ("Off-Taker Events of Default") shall occur:

(i)     Misrepresentation. Any representation or warranty by Off-Taker hereof, is incorrect or incomplete in any material way, or omits to include any information necessary to make such representation or warranty not materially misleading, and such defect is not cured within thirty (30) days after receipt of notice from Provider identifying the defect.

(ii)     Obstruction. Off-Taker obstructs commencement of installation of the Project or fails to take any actions necessary for the interconnection of the Project, or fails to take electric energy produced by the Project, and fails to correct such action within ten (10) days of when such payment was due.

(iii)     Payment Failure. Off-Taker fails to make any payment due under the terms of this Agreement, and fails to make such payment within sixty (60) days after receipt of notice thereof from Provider.

(iv)     Obligation Failure. Off-Taker fails to perform any obligation hereunder, such failure is material, such failure is not excused by Force Majeure Events, and such failure is not cured within: (A) ten (10) days if the failure involves a failure to maintain required insurance; or (B) sixty (60) days if the failure involves an obligation other than payment or the maintenance of insurance, after receipt of notice from Provider identifying the failure.

(v)     Insolvency. Off-Taker (A) applies for or consents to the appointment, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or a substantial portion of its property; (B) admits in writing its inability, or be generally unable, to pay its debts as such debts become due; (C) makes a general assignment for the benefit of its creditors; (D) commences a voluntary case under any bankruptcy law; (E) files a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up, or composition or readjustment of debts; (F) acquiesces in, or fails to contest in a timely manner, any petition filed against Off-Taker in an involuntary case under bankruptcy law or seeking to dissolve Off-Taker under other Applicable Law; or (G) takes any action authorizing its dissolution.

(b)     Default Damages. Upon an Event of Default by Off-Taker, Provider may sell electricity produced by the Project to persons other than Off-Taker, and recover from Off-Taker any loss in revenues resulting from such sales; and/or pursue other remedies available at law or in equity.

## 21.   LIMITATIONS ON DAMAGES.

EXCEPT AS EXPLICITLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY NOR ANY OF ITS INDEMNIFIED PERSONS SHALL BE LIABLE TO THE OTHER PARTY OR ITS INDEMNIFIED PERSONS FOR ANY SPECIAL, PUNITIVE, EXEMPLARY, INDIRECT, OR CONSEQUENTIAL DAMAGES, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

## 22.   DISPUTE RESOLUTION.

(a)     Negotiation Period. The Parties shall negotiate in good faith and attempt to resolve any dispute, controversy or claim arising out of or relating to this Agreement (a "Dispute") within 30 days after the date that a Party gives written notice of such Dispute to the other Party.

(b)     Mediation. If, after negotiation, the Dispute remains unresolved, either Party may require that a non-binding mediation take place. In such mediation, representatives of the Parties with authority to resolve the dispute shall meet for at least three (3) hours with a mediator whom they choose together. The mediator's fee and expenses shall be paid one-half by each Party.

(c)     Arbitration of Disputes.

(i)     Rules of Arbitration. Any Dispute that is not settled to the mutual satisfaction of the Parties shall be settled by binding arbitration between the Parties conducted in Rensselaer, New York, or such other location mutually agreeable to the Parties, and in accordance with the Construction Industry Mediation Rules of the American Arbitration Association in effect on the date that a Party gives notice of its demand for arbitration.

(ii)     Dispute Submission. The Party initiating the Arbitration (the "Submitting Party") shall submit such Dispute to arbitration by providing a written demand for arbitration to the other Party (the "Responding Party"), which demand must include statements of the facts and circumstances surrounding the dispute, the legal obligation breached by the other Party, the amount in controversy and the requested relief, accompanied by all relevant documents supporting the Demand.

(d)     Exceptions to Arbitration. The obligation to arbitrate shall not be binding upon any Party with respect to (i) requests for preliminary injunctions, temporary restraining orders, specific performance, or other procedures in a court of competent jurisdiction to obtain interim relief deemed necessary by such court to preserve the status quo or prevent irreparable injury pending resolution by arbitration of the actual Dispute; (ii) actions to enforce an award of a Panel or otherwise to collect payments not subject to bonafide dispute; or (iii) claims involving third parties who have not agreed to participate in the arbitration of the Dispute.

(e)    Survival of Arbitration Provisions. The provisions of this Section shall survive any termination of this Agreement and shall apply (except as provided herein) to any disputes arising out of this Agreement.

## 23.    NOTICES.

Delivery of Notices. All notices or other communications which may be or are required to be given by any party to any other party pursuant to this Agreement shall be in writing and shall be either (i) delivered by hand; (ii) mailed by first-class, registered or certified mail; (iii) delivered by a recognized overnight or personal delivery service; (iv) transmitted by facsimile or (v) transmitted by email as follows:

> **If to Off-Taker:**
> Off-Taker: FCOM
> Address: 8 Hemphill Pl Ballston Spa, NY 12020
> Mailing Address: P.O. Box No. 2243
>
> Email: firecompaniesofmalta@gmail.com
> Phone: 518-289-5369
>
> **If to Provider:**
> Monolith Solar Associates, LLC
> 444 Washington Street
> Rensselaer, NY 12144
> info@monolithsolar.com
> Phone: (518) 444-2044
> Fax: (518) 621-7061

## 24.    MISCELLANEOUS.

(a)    Governing Law. This Agreement shall be governed by the laws of the State of New York, including principles of good faith and fair dealing that will apply to all dealings under this Agreement.

(b)    Rules of Interpretation. Section headings are for convenience only and shall not affect the interpretation of this Agreement. References to sections are, unless the context otherwise requires, references to sections of this Agreement. The words "hereto", "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "person" shall include individuals; partnerships; corporate bodies (including but not limited to corporations, limited partnerships and limited liability companies); non-profit corporations or associations; governmental bodies and agencies; and regulated utilities. The word "including" shall be deemed to be followed by the words "without limitation". In the event of any conflict between the text of this Agreement and the contents of an Exhibit hereto, the text of this Agreement shall govern.

(c)    Severability. If any non-material part of this Agreement is held to be unenforceable, the rest of the Agreement will continue in effect. If a material provision is determined to be unenforceable and the Party which would have been benefited by the provision does not waive its unenforceability, then the Parties shall negotiate in good faith to amend the Agreement to restore to the Party that was the beneficiary of such unenforceable provision the benefits of such provision.

(d)    Amendment and Waiver. This Agreement may only be amended by a writing signed by both Parties. Any waiver of any of the terms hereof shall be enforceable only to the extent it is waived in a writing signed by the Party against whom the waiver is sought to be enforced. Any waiver shall be effective only for the particular event for which it is issued and shall not constitute a waiver of a subsequent occurrence of the waived event nor constitute a waiver of any other provision hereof, at the same time or subsequently.

(e)    Assignment. Neither Party may assign, sell, transfer or in any other way convey its rights, duties or obligations under this Agreement, either in whole or in part, without the prior written consent of the other Party which consent shall not be unreasonably withheld or delayed, except that without consent of Off-Taker, Provider (i) may assign its rights and obligations hereunder to an Affiliate of Provider and (ii) may sell or collaterally assign this Agreement. For purposes of this Section, transfer does not include any sale of all or substantially all of the assets of Provider or Off-Taker or any merger of Provider or Off-Taker with another person, whether or not Provider or Off-Taker is the surviving entity from such merger, or any other change in control of Provider or Off-Taker, provided any

such surviving entity assumes all obligations of Provider or Off-Taker, as appropriate, under this Agreement; provided however, with respect to Off-Taker, such surviving entity is acceptable to Financing Party in its sole discretion.

(f)    <u>Service Contract</u>.  This Agreement is a service contract pursuant to Section 7701(e)(3) of the Internal Revenue Code.

(g)    <u>No Joint Venture</u>.  This Agreement does not create a joint venture, partnership or other form of business association between the Parties.

(h)    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery of signature by fax, or scan delivered by email, receipt acknowledged, or electronic signature are effective to bind a Party hereto.

IN WITNESS WHEREOF, intending to be legally bound hereby, Provider and Off-Taker have executed this Power Purchase Agreement as of the date first set forth above.

**Monolith Solar Associates, LLC**

By: _____

Name (printed): Steven Erby

Title: Owner


**FCOM (Off-Taker)**

By: _____

Name (printed): JOHN W. BERGGREN

Title: PRESIDENT, BOARD OF DIRECTORS

Monolith Solar Associates, LLC
Power Purchase Agreement - Remote Net Metering
Ver October 2014 -- Last Printed October 23, 2014

14

EXHIBIT A

**Project Specifications**

**Installation Address**: TO BE DETERMINED

All Projects shall be installed at designated Remote Site, owned and operated by Provider, located within same NYISO Load Zone as Off-Taker.

**Project Size:** 75,000 Watt Net Metered, Ground Mount Grid Tied Solar Electric System.

**Off-Taker Power Utility Account Number** – There will be 1 Off-Taker Account Number(s). Such Account Numbers will be identified at time of Installation.

**Satellite Power Utility Account Number(s)** –        53175-24007

**Annual Historical Usage** –        87,744 kWh

**Estimate of Energy Output** –        The system is estimated to produce 87,750
        kWh annually (100% of historical usage).

**Data Collection** –                        The PV System will include a Utility Style AC meter located near the inverter. This meter will provide a method of recording total energy generated by the PV system.

Provider agrees to collect and report readings from the system every 3 months or as required by NYSERDA for a period of 3 years.

EXHIBIT B

## PAYMENT SCHEDULE – ENERGY PURCHASE RATES

PROVIDER and OFF-TAKER agree as follows:

The total charges payable by Off-Taker under the Power Purchase Agreement are as set forth in this Schedule.

### RATE:

The Cost per kWh will be set at the following rate for the first year following the Operation Date: **$0.100**

An annual escalation of the Cost per kWh shall be applied each year on the anniversary date. The annual escalation will be applied at a rate of 1.75% per year of the Agreement term. The first escalation shall be applied upon day 1 of year 2 of Operation.

### REMOTE NET METERING:

Under Remote Net Metering laws, Off-Taker will receive a Remote Net Metering credit for each kWh produced by the Project and applied as a monetary credit to Off-Taker's designated Satellite Utility Account(s). The credit will be converted to a dollar amount by adding the delivery per kWh charge and energy per kWh charge times the excess kWh (example: Delivery + Commodity = Credit * kWh).

Example Calculation

| | | |
|---|---|---|
| Current Estimated Remote Net Metering credit per kWh from Utility: | | $0.142 |
| Cost per kWh from Provider: | | $0.100 |
| | *Difference* | $0.042 |

### SAVINGS FLOOR:

Provider warrants that the savings experienced (i.e. difference between Remote Net Metering credit and Cost per kWh charged by Provider) will be a minimum of 10% on a quarterly basis. Adjusted cost per kWh will not be lower than $0.08.

Example Calculation

| | | |
|---|---|---|
| Reduced Remote Net Metering credit per kWh from Utility: | | $0.090 |
| Adjusted Cost per kWh from Provider: | | $0.081 |
| | *Difference* | $0.009  (10% Floor) |

### BILLING:

**The Off-Taker will receive an invoice from Provider quarterly.** On each invoice, the quantity of electricity produced by the Project, the applicable rates, and the total amount due will be detailed.

**FCOM (Off-Taker)**

_____
Signature

JOHN W. BERGGREN
Name (Print)

3/20/15
Date

**PROVIDER**

_____
Signature

Steven Erby
Name (Print)

3/22/15
Date

Monolith Solar Associates, LLC
Power Purchase Agreement - Remote Net Metering
Ver October 2014 – Last Printed October 23, 2014

16

EXHIBIT B-1

Energy Purchase Rates Schedule

| Monolith kWh Billing Rate | $0.100 |
|---|---|
| Annual Rate Escalator | 1.75% |

| Year | Monolith kWh Rate |
|---|---|
| 1 | $0.100 |
| 2 | $0.102 |
| 3 | $0.104 |
| 4 | $0.105 |
| 5 | $0.107 |
| 6 | $0.109 |
| 7 | $0.111 |
| 8 | $0.113 |
| 9 | $0.115 |
| 10 | $0.117 |
| 11 | $0.119 |
| 12 | $0.121 |
| 13 | $0.123 |
| 14 | $0.125 |
| 15 | $0.127 |
| 16 | $0.130 |
| 17 | $0.132 |
| 18 | $0.134 |
| 19 | $0.137 |
| 20 | $0.139 |

Monolith Solar Associates, LLC
Power Purchase Agreement - Remote Net Metering
Ver October 2014 – Last Printed October 23, 2014

17

EXHIBIT C

PV Watts Report - Production Guarantee Table

For the term of the Agreement, Provider guarantees the Project will produce within a 20% variance from annual predicted model as developed from PV Watts for the installed system design (see Exhibit D for production guarantee). Should Project performance be less than guaranteed, Provider will compensate Off-Taker for each kWh below 80% of predicted output. The rate at which Off-Taker will be compensated shall be the difference between the total of the utility kWh rate and Provider's contracted kWh rate, thus guaranteeing the promised economic savings on energy/power delivered. The degradation of Project performance is guaranteed to be no more than 0.9% per year. Provider shall not be held to this Production Guarantee in the event of equipment manufacturer's default of equipment warranty or lack of near term availability of replacement parts and equipment.

| Year | Annual AC Energy Production Basis (kWh) |
|------|------------------------------------------|
| 1 | 87,750 |
| 2 | 86,960 |
| 3 | 86,178 |
| 4 | 85,402 |
| 5 | 84,633 |
| 6 | 83,872 |
| 7 | 83,117 |
| 8 | 82,369 |
| 9 | 81,627 |
| 10 | 80,893 |
| 11 | 80,165 |
| 12 | 79,443 |
| 13 | 78,728 |
| 14 | 78,020 |
| 15 | 77,318 |
| 16 | 76,622 |
| 17 | 75,932 |
| 18 | 75,249 |
| 19 | 74,572 |
| 20 | 73,900 |

Source: *http://rredc.nrel.gov/solar/calculators/pvwatts/version1/US/code/pvwattsv1.cgi*

Monolith Solar Associates, LLC
Power Purchase Agreement - Remote Net Metering
Ver October 2014 – Last Printed October 23, 2014

18