UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
KEYBANK NATIONAL ASSOCIATION,

Plaintiff, and

CAPITAL COMMUNICATIONS FEDERAL CREDIT
UNION,

Intervenor,                          **1:19-CV-1562-DNH-ATB**

            -v-

MONOLITH SOLAR ASSOCIATES LLC, et al., and
GARY HICKOK d/b/a GARY'S GARAGE.

Defendants.
--------------------------------------------------------------------x

**AFFIDAVIT IN SUPPORT OF MOTION TO PURGE AND VACATE ORDER OF
CONTEMPT AND IN OPPOSITION TO APPLICATION FOR ATTORNEYS FEES**

STATE OF FLORIDA              )
                              )SS:
COUNTY OF INDIAN RIVER        )

Gary Hickok being duly sworn deposes and says:

1.  Your Deponent is named as a Defendant in this action on behalf of Gary's Garage and
    makes this Affidavit in support of his motion to purge and vacate the Order of Contempt
    and in opposition to the Receiver's request for attorney's fees.

2.  **AS A PRELIMINARY STATEMENT**, your Deponent acknowledges that this Court has
    issued an Order of Contempt arising out of a certain Lease Agreement ostensibly between
    Gary's Garage and Monolith Solar Associates LLC pursuant to which solar panels were
    installed at 5, 8, 8A, and 9 Apollo Drive, Albany, New York 12205.

3.  Your Deponent has now been advised and understands the nature of these proceedings and
    has taken immediate action to restore power to the Monolith solar panel systems which
    was accomplished on Friday, August 14, 2020 with simultaneous notice given to
    Receiver's counsel. Please see **Exhibit A**.

4. Your Deponent has also requested and received instructions for providing access to the equipment by the Receiver or his representatives and has provided the key person contact information as set forth in **Exhibit B**.

5. This matter arises out of a certain Lease Agreement with Monolith Solar Associates LLC, a copy which is attached as **Exhibit C**. This is an undated and unsigned copy but is all that we have from Monolith.

6. In addition to being undated and unsigned the Lease also improperly names your deponent d/b/a Gary's Garage as a party. The Lease was supposed to be with G&F Property Management, LLC., not Gary's Garage, which is also improperly named as it is a corporation. Your deponent is a Principal of G&F Property Management, LLC., and did not realize that the Lease was improperly drafted identifying Gary's Garage.

7. G&F Property Management, LLC. is the owner of the properties of 5, 8, 8A and 9 Apollo Drive.

8. The Lease was supposed to commence in 2016 but Monolith was never able to become operational until 2018.

9. The Lease consideration provided for a 'Singing Bonus' in the amount of $45,000.00 and then annual payments of $4,500.00 commencing upon the start of commercial operations with an annual increase of 1.75%.

10. The $45,000.00 signing bonus was never fully paid with an outstanding balance of approximately half. Partial payments that were made were intermittent and generally only after being warned that without payment the system would be shut down which it periodically was.

11. Promises by Monolith to resume and complete payments of the signing bonus were given as shown in **Exhibit D** but were never honored. No Lease payments were ever made notwithstanding that Monolith continued to operate the system on defendant's power bill and presumably derive revenue.

12. Contact with or on behalf of Monolith became increasingly disingenuous, and discourteous and with an obvious intent to say anything but continue to breach the Lease.

13. With respect to the papers that are the subject proceeding, your deponent never knowingly or intentionally intended to disobey or disrespect this Court. These proceedings occurred substantially during the COVID-19 emergency. Your Deponent had to be in the State of Florida for much of this time and is presently still stuck in Florida due to the mandatory quarantine if my wife and I return now.

14. The dishonest and false representations made by Monolith caused a contentious relationship and also fostered eventual confusion over who we were dealing with when contacts were made by or on behalf of the Receiver. There was admittedly confusion but there was no intent to disobey the Court.

15. During this time, in January of 2020, the business of Gary's Garage was also sol and the properties leased to the new operator. Contacts to employees of the new operator may also have been misunderstood.

16. We are a family owned business for almost 5 decades. We have always maintained an honorable reputation in our community and business environment.

17. Upon being advised of the nature of these proceedings and of the Order of the Court, a copy of which is attached as **Exhibit E**, your deponent acted promptly to direct that the power be restored to the Monolith systems and to designate an on-site contact person with authority to facilitate any required access or other cooperation with the Receiver.

18. We have been and continue to be economically damaged by the conduct of Monolith not only in the breach of its Lease but also in the restored and continued operation of the system on our electric meter, but are and will continue to cooperate with the Court and the Receiver.

19. Ironically, we have very recently been resolicited by the Principal of Monolith to invest in yet another solar energy project or scheme. We will not do that, but we will comply with all directives of the Court.

20. Accordingly, we respectfully request to be purged from the contempt citation and penalties.

21. We request relief from the previous Order of the Court based upon our misstate, inadvertence and confusion and that the Order of the Court has now been fully complied with.

22. We request that the pleadings be corrected to name the correct parties.

23. We request that the Court, deem these circumstances to be excusable with the assurance that full and timely compliance with ongoing requirements will be maintained.

24. With respect to the application for counsel fees we acknowledge that the Receiver incurred expenses but request reasonable relief based upon the circumstances set forth above.

**WHEREFORE,** your Deponent respectfully prays this Court for an Order purging and vacating the Order of Contempt and the penalties associated therewith directing the pleadings to be amended to reflect the proper parties and for such other and further relief that the Court may deem just, proper and equitable.

Date: ___8/19/20___               ___Gary Hickok___
                                        Gary Hickok

Sworn to before me this __7th__ day
of __August_____, 2020

___Lorry Anne Hoover___
Notary Public

Lorry Anne Hoover
Comm. # GG929461
Expires: Nov. 5, 2023
Bonded Thru Aaron Notary

# EXHIBIT A

**Frederick Altman** <fmaesq@yahoo.com>                          Fri, Aug 14 at 5:03 PM
**To:** Justin Heller
**Cc:** Brian Deinhart
**Bcc:** PATRICK HICKOK

Gentlemen,

I advised our client to reactivate the solar panels and I was told that they could do it themselves. I have now been told that the panels are activated. The attached four (4) photographs show the breakers in the 'on' position.

We will file a Notice of Appearance and formally notify the Court that this has been accomplished.

Upon verification with the Receiver I request that you also confirm this to the Court.

Thank you.

*Frederick M. Altman, Esq.*
*The Altman Law Firm*
*6 Walker Way*
*Albany, New York 12205-4946*
*(518) 690-2828*


*PLEASE NOTE: THIS OFFICE DOES NOT ACCEPT SERVICE OF PAPERS, PLEADINGS, DOCUMENTS OR NOTICES BY FAX OR E-MAIL WITHOUT WRITTEN CONSENT.*


*NOTE:  This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited.*


*If you have received this communication in error, please notify us immediately by telephone (collect) at (518) 690-2828 .  We will reimburse you for the postage. Thank you.*









# EXHIBIT B

# The Altman Law Firm

SIX WALKER WAY
ALBANY, NEW YORK 12205-4946
Telephone (518) 690-2828
Telefax (518) 690-2809

August 18, 2020

*Sent by email: jheller@nhkllp.com*
*and bdeinhart@nhkllp.com*

Nolan Heller and Kauffman, LLP
80 State St.
11th Floor
Albany, NY  12207

Attn:   Justin A. Heller, Esq.
        Brian D. Deinhart, Esq.

Re:   **KeyBank National Association v. Monolith Solar Associates LLC, et al.**
      **Case No.: 1:19-CV-1562**

Dear Mr. Heller and Mr. Deinhart,

In follow-up to our notification that the electric power had been restored on Friday, August 14, 2020, I can now provide onsite contact information for immediate access to the properties as a necessary:

Contact Person:     Patrick Hickok

Telephone (Cell):   (518) 573-3663

Address:            9 Apollo Drive, Albany, NY 12205

Email:              Garysgarage1@aol.com

Gary Hickok is in Florida and cannot return to New York without being subjected to a mandatory quarantine, however, Patrick Hickok is in New York at the site and will provide immediate access as required.

Thank you.

Very truly yours,

Frederick M. Altman, Esq.

cc:    Gary Hickok
       Patrick Hickok

# EXHIBIT C



## LEASE AGREEMENT

This Lease Agreement (this "Lease") is made effective as of ~~Enter Date~~, by and between Gary's Garage ("Lessor") with its principal office located at 8 Apollo Drive Albany NY 12205, and Monolith Solar Associates LLC ("Lessee") with its principal office located at 444 Washington Street, Rensselaer, NY 12144 to lease certain Premises. The parties agree as follows:

**PREMISES.** Lessor, in consideration of the lease payments provided in this Lease, agrees to lease to Lessee roof space (the "Premises") capable of supporting a 600,000-watt solar electric power generating system(s) (the "PV System") located at Same as above (the "Property").

**TERM.** The Lease will begin on the date of its execution and expire twenty (20) years after Commercial Operation. Commercial Operation is the date upon which the PV System is granted permission to operate by the utility company. Lessor grants Lessee the right, privilege and option to extend the Lease for two (2) extension periods of five (5) years each, upon the same terms and conditions as contained in the Lease, with notice in writing to Lessor at least ninety (90) days prior to the expiration of the term or preceding extension of the term. Notwithstanding the foregoing, Lessee and Lessor acknowledge and agree that this Lease shall be coterminous with the term in a Power Purchase Agreement associated with the PV System.

**LEASE PAYMENTS.** Lessee shall pay to Lessor $4,500.00 per year, beginning upon Commercial Operation and then payable in advance annually on the anniversary date of Commercial Operation. Such lease payments shall increase yearly at a rate of 1.75%.

**SIGNING BONUS.** Lessor shall receive a signing bonus of $45,000.00 if signed by 12/12/2016, 2016. The signing bonus is fully earned and payable upon Commercial Operation of the PV System, subject to the contingencies below.

**POSSESSION.** Lessee shall be entitled to possession as of the date of execution of this Lease, and shall return possession to Lessor on the last day of the term of this Lease, unless otherwise agreed by both parties in writing. Lessee shall have the right to receive any security codes or access necessary to occupy the Premises as needed by the Lessee. At the end of the term, Lessee shall remove its property and return the Premises to Lessor in as good condition as when delivered to Lessee, ordinary wear and tear excepted.

**USE OF PREMISES.** Lessee shall have the right upon full execution of this Lease to develop, permit, store equipment for, construct, reconstruct, finance, install, maintain, repair, replace, decommission, use, own, and operate a PV System, including ingress to and egress from, all electrical collection, transmission and interconnection facilities, and access and service roads related to the PV System on the Premises and other improvements necessary for the generation, storage, selling, and delivery of electrical power from the Premises to the local electricity distribution system and/or the local electrical transmission system.

**CONTINGENCIES.** Lessee shall have an Inspection Period commencing on full execution and delivery of this Lease within which to perform due diligence, and to investigate, apply for, and pursue such permits and approvals, in each and every case, as Lessee determines are necessary or desirable, in its sole and

absolute discretion including, but not limited to, (i) municipal/governmental approval for installation of a roof mounted PV System on the Premises; and (ii) utility approval for interconnection within a reasonable cost to the Lessee, (iii) approval of financial incentives from the NY-Sun Incentive Program; and (iv) a structural analysis letter allowing the installation to proceed. Lessor agrees to execute any papers and documents reasonably necessary to complete contingencies as well as any papers necessary for third-party consents such as financing parties. Lessee has the right to cancel this Lease or reduce the lease payment amount or bonus amount based on the ability and availability to install a roof mounted PV System.

**LESSOR WARRANTIES**. Lessor warrants that Lessor is not in default under any mortgage and that there are no pending or threatened litigation relating to the ownership, use, or possession of the Property.

**INSURANCE**. At all times during the term of the Lease, Lessee shall maintain and pay for liability insurance covering certain risks arising directly or indirectly out of Lessee's activities on the Premises. Lessee shall maintain General Liability coverage of one million dollars ($1,000,000) for each occurrence, and two million dollars ($2,000,000) in the aggregate. Lessee shall maintain Umbrella Liability coverage of five million dollars ($5,000,000). Lessee shall also have Worker's Compensation Insurance for the entirety of all installation processes. Lessor shall maintain adequate casualty and general liability insurance coverage for the Property for the duration of the Lease.

**MAINTENANCE**. Lessor shall have the responsibility to maintain the Premises in good repair at all times and perform all repairs necessary except that Lessee shall be responsible for maintaining the PV System and addressing any roof related concerns as a result of the PV System. Lessee shall have access at any hour to clean, maintain, repair, or replace its equipment. Lessee shall make reasonable attempts to give notice to Lessor of its planned visit to the Premises.

**TAXES**. Lessee shall pay real and personal property taxes assessed or levied against the Premises as a result of the PV System during the term of the Lease.

**FORCE MAJEURE**. If the Premises are damaged or destroyed by fire or other casualty to the extent that the use is substantially impaired, Lessor, in its sole discretion may elect to repair the Premises or terminate the Lease upon thirty (30) days' written notice to Lessee. If the Premises are condemned or cannot be repaired or the PV System cannot be repaired, this Lease will terminate upon twenty (20) days' written notice by either party and Lease payment amounts will be prorated to the date of termination.

**DEFAULT BY LESSEE**. Lessee shall be in default of this Lease if Lessee fails to fulfill any lease obligation or term by which Lessee is bound. If Lessee fails to cure any financial obligation within thirty (30) days after written notice of such default is provided by Lessor to Lessee, Lessor may elect to cure such default and the cost of such action shall be added to Lessee's financial obligations under this Lease.

**INDEMNIFICATION**. Each party, its subsidiaries, affiliates, and assigns (the "Indemnifying Party") shall not be liable for any damage or injury to the other party, or any other person, or to any property, occurring on the Premises or any part thereof or as a result of possession or use of the Premises, or business operations on the Property, except to the extent caused by the gross negligence or willful misconduct of the other party. The Indemnifying Party agrees to indemnify and hold the other party harmless from any

and all damages, costs, liabilities, penalties, fines, forfeitures, demands, claims, causes of action, suits and costs and expenses incidental thereto, and all other losses, to the extent arising, directly or indirectly, in connection with the Indemnifying Party's use or possession of the Property or business operations on the Property. Said indemnification shall include indemnity from any costs or reasonable fees which the other party may incur in defending said claim.

**REMODELING OR STRUCTURAL IMPROVEMENTS**. Should Lessor require remodeling or structural improvements to the Premises that would affect the PV System, Lessor shall provide written notice to Lessee thirty (30) days in advance. Should Lessee have to remove the PV System, the fair market value for removal and reinstallation of the PV System shall be deducted from the lease payment due Lessor in the following year.

**NO INTERFERENCE.** Lessor shall not enter into any agreements, leases, lease renewals, easements, or any other arrangements for rights to or for the Property that could adversely affect the Premises, or the ownership, operation, or use of the PV System, or the transmission and interconnection facilities. Lessor's activities and any grant of rights by Lessor to any third party shall not, now or in the future, interfere with any rights granted to Lessee under this Lease. Without limiting the foregoing, Lessor shall not: (a) construct or permit to be constructed any structure; (b) plant or allow to be planted any trees or other vegetation; or (c) allow any other obstruction, in each case, on the Property or adjacent to the Premises, that is reasonably expected to decrease the output or efficiency of the PV System or adversely affect insolation. Lessor has no right or interest in or to the PV System or any appurtenances thereto. The PV System shall remain the sole personal property of the Lessee or its assigns. Lessor waives any rights or claims to a lien or other interest in the PV System. Lessor shall sign any consent acknowledging such.

**DANGEROUS MATERIALS**. Lessee shall not keep or have on the Premises any article or thing of a dangerous, flammable, or explosive character that might substantially increase the danger of fire on the Premises, or that might be considered hazardous by a responsible insurance company, unless the prior written consent of Lessor is obtained and proof of adequate insurance protection is provided by Lessee.

**ASSIGNABILITY/ SUBLETTING**. Lessee may sublet the Premises in whole or in part without Lessor's consent, but the making of any sublease shall not release Lessee from, or otherwise affect in any manner, any of Lessee's obligations under this Lease. Lessee may assign, collaterally assign, or transfer this Lease Agreement, or any interest in this Lease Agreement, whole or in part without Lessor's consent. This Lease shall inure to the benefit of and be binding upon Lessor and Lessee, their heirs, successors and assigns (including each Assignee). Lessor agrees that the rights of Lessee under this Lease shall extend to agents, representatives, employees, contractors, subcontractors and other service providers of Lessee

**CHANGE IN LAW OR CIRCUMSTANCE.** If there is a change in law or circumstance that occurs that will affect the operation of a PV System, Lessee shall be responsible for dealing with reasonable increases in costs or remediation as required. If such change in law makes operation of a PV System impossible or impracticable, Lessee may terminate this Lease. Upon notice of termination, Lessee shall have twelve (12) months to remove the system from the Premises.

**GOVERNING LAW**. This Lease will be construed in accordance with the laws of the State of New York.

**NOTICE.** Notices under this Lease shall be deemed invalid unless given or served in writing and forwarded by mail, postage prepaid, addressed to the party at the appropriate address set forth below. Such addresses may be changed from time to time by either party by providing notice as set forth below. Notices mailed in accordance with these provisions shall be deemed received on the third day after posting.

**LESSOR:**

Enter Business Name
**Attn:** Enter Business Contact Person
Enter Lessor's Business Address.
Enter City, State, Zip

**LESSEE:**

Monolith Solar Associates LLC
Attn: Steven Erby
444 Washington Street
Rensselaer, NY 12144

**ENTIRE AGREEMENT/AMENDMENT.** This Lease supersedes all other previous agreements regarding the roof of the Premises. This Lease contains the entire agreement of the parties and there are no other promises, conditions, understandings or other agreements, whether oral or written, relating to the subject matter of this Lease. This Lease may be modified or amended in a writing signed by both parties.

**SEVERABILITY.** If any portion of this Lease shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Lease is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**WAIVER.** The failure of either party to enforce any provisions of this Lease shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Lease.

**BINDING EFFECT.** The provisions of this Lease shall be binding upon and inure to the benefit of both parties and their respective legal representatives, successors and assigns.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Lease the date first above stated.

**LESSOR:**

Enter Lessor Business Name

_____
by: Enter Signor's Name

Enter Signor's Title_____
Title

_____
Date

**LESSEE:**

**Monolith Solar Associates LLC**

_____
by: Steven Erby

COO_____
Title

_____
Date

# EXHIBIT D

Gina Cachioli
Monolith Payment Update
Jun 13, 2018, 3:59:15 PM
garysgarage1@aol.com
Ron Mnieckowski

Good Afternoon Mr. Hickok,

I wanted to reach out to you regarding the remainder of the bonus and lease payment that is due for the Gary's Garage project.  Each week our CFO, Ron Mnieckowski, provides updates as to what payments are to be issued for the week.  He is currently out of town for a few weeks, however I will be your contact in his absence.  We are aware that we need to issue your payment as soon as possible, and will update you each Friday if that payment will be released based on our weekly cash forecast.

We thank you for your continued patience until we can get this payment out to you. I will be sure to follow up with you this Friday to indicate if I am able to send payment.  Also, in reviewing our records, it appears that we do not have a W-9 for your company on file, and we would need this before final payment can be issued. Please send this over at your earliest convenience.

Please let me know if you have any questions.

Thank you,


Gina Cachioli
*Accounting Director*

monolith
solar


Please note effective March 19, 2018 our new office location and mailing address is
16  Corporate Woods Blvd, Suite 1, Albany, NY  12211


16 Corporate Woods Blvd. Suite 1
Albany, NY 12211
Tel: 518.444.2044
Fax: 518.621.7061
Gina.Cachioli@monolithsolar.com
http://www.monolithsolar.com
Confidentiality Note: This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended

recipients. Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Monolith Solar is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this   message and any attachment are solely those of the author and do not necessarily represent those of the company.

# EXHIBIT E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KEYBANK NATIONAL ASSOCIATION,

                Plaintiff, and

CAPITAL COMMUNICATIONS FEDERAL
CREDIT UNION,

                Intervenor,

       -v-                                1:19-CV-1562

MONOLITH SOLAR ASSOCIATES LLC, et al.,
                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


APPEARANCES:                          OF COUNSEL:

THOMPSON, HINE LAW FIRM-NY        BARRY M. KAZAN, ESQ.
Attorneys for Plaintiff
335 Madison Avenue 12th Floor
New York, New York 10017

THOMPSON, HINE LAW FIRM-CLEVELAND    CURTIS LEE TUGGLE, ESQ.
Attorneys for Plaintiff
3900 Key Center
127 Public Square
Cleveland, Ohio 44114

THOMPSON HINE LLP               JONATHAN S. HAWKINS, ESQ.
Attorneys for Plaintiff
Austin Landing I
10050 Innovation Drive Suite 400
Miamisburg, Ohio 45342

LIPPES MATHIAS WEXLER & FRIEDMAN LLP   JOHN D. RODGERS, ESQ.
Attorneys for Intervenor
54 State Street Suite 1001
Albany, New York 12207

THE WAGONER FIRM PLLC          MATTHEW D. WAGONER, ESQ.
Attorneys for Defendant Steven A. Erby
150 State Street, Suite 504
Albany, New York 12207

NOLAN HELLER KAUFFMAN LLP                    JUSTIN A. HELLER, ESQ.
Attorneys for Receiver, Daniel Scouler       FRANCIS J. BRENNAN, ESQ.
80 State Street, 11th Floor                  JOHN V. HARTZELL, ESQ.
Albany, New York 12207

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

On December 18, 2019, plaintiff KeyBank National Association ("KeyBank" or "plaintiff") filed this breach of contract action seeking to foreclose on certain secured interests it had obtained against Monolith Solar Associates LLC ("Monolith"), its owners, and several other power companies with common ownership.  Dkt. 1.  Plaintiff alleges that defendants have breached each of those agreements and are therefore liable to plaintiff to the tune of $6.1 million.  *See id.* ¶ 2.

On December 20, 2019, Daniel Scouler ("Scouler" or "the receiver") was appointed as receiver under Federal Rule of Civil Procedure ("Rule") 66 to manage the power companies during the pendency of the foreclosure action.  *See generally* Dkt. 7.  At the same time, the Court imposed a stay of all outside litigation against the receivership properties absent express permission.  *Id.* ¶ 21; *see* Dkt. 96, ¶ 21 (including same language of stay in updated Second Order Modifying Receivership Order).  The stay also prohibited "all . . . persons . . . from doing any act or thing whatsoever to interfere with the [r]eceiver in the discharge of [his] duties . . . ."  Dkt. 7, ¶ 21; Dkt. 96, ¶ 21.

On December 9, 2016, non-party Gary Hickok ("Hickok") agreed to lease rooftop space at his business, Gary's Garage, located at 8A Apollo Drive, Albany, New York 12205, to Monolith so that it could install a solar panel, called a PV system, on his roof.  Dkt. 124, ¶ 5.  Perhaps unsurprisingly, Monolith fell behind on its lease payments, and now owes Hickok $13,737.63.  *Id.* ¶ 8.

2

Upon being named receiver, Scouler told Monolith's lessors, including Hickok, that he needed to have continued access to the company's PV system at Gary's Garage, and in exchange promised to resume rent payments beginning in April of 2020.  Dkt. 124, ¶ 9. Although this would not reimburse the lessors for the rent they were already owed, neither would it interfere with their ability to collect that rent upon the conclusion of the receivership. *Id.*

Although most lessors were satisfied with this arrangement, it would seem that Hickok was not.  Dkt. 124, ¶¶ 9-10.  Toward the end of March 2020, Hickok allegedly disconnected the PV system at Gary's Garage.  *Id.* ¶ 10.  On April 1, 2020, Scouler was able to contact Hickok's son, who insisted that the receiver would not have access to the leased premises until he paid all the rent that Monolith owed.  *Id.*

On April 3, 2020, counsel for Scouler wrote to Hickok explaining the scope and nature of the receiver's authority and provided him a copy of the Order Appointing Receiver. Dkt. 124, ¶ 11.  Apparently, this first letter did nothing to change the status quo, and the receiver's counsel wrote Hickok again on May 12, 2020.  *Id.* ¶ 12.  The second letter warned that if Hickok did not allow the receiver access to the premises within seven days, he would request an order to show cause why he should not be held in civil contempt of the receivership order.  *Id.*  Monolith employees nevertheless called Hickok on the telephone on May 26 and 28, 2020, but to no avail.  *Id.* ¶ 13.  In total, the receiver projects that Monolith lost approximately $9,729.00 between April and June of 2020 because it was denied power from this PV system.  *Id.* ¶ 21(b).

On June 15, 2020, Scouler moved for an order to show cause why Hickok should not be held in civil contempt.  Dkt. 124.  On June 17, 2020, that order followed, requiring that Hickok show cause no later than Wednesday, July 8, 2020.  Dkt. 129.  As part of the same

decision, the receiver was also ordered to personally serve Hickok no later than Friday, June 26, 2020. *Id.* at 3.   On June 23, 2020, the receiver personally served Hickok.  Dkt. 137. Nevertheless, he has not made any appearance or answer to the order to show cause.  The order to show cause being unopposed, it will now be decided on the basis of the parties' submissions without oral argument.

Civil contempt is "[a] sanction imposed to compel obedience to a lawful court order or to provide compensation to a complaining party . . . ."  *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989).  "Federal courts maintain the inherent power to enforce their orders by civil contempt."  *Drew-King v. Deep Distributors of Greater NY, Inc.*, 274 F. Supp. 3d 132, 136 (E.D.N.Y. 2017) (cleaned up).

A party may be held in civil contempt for failure to comply with a court order if:  "(1) the order the contemnor failed to comply with is clear and unambiguous[;] (2) the proof of noncompliance is clear and convincing[;] and (3) the contemnor has not diligently attempted to comply in a reasonable manner."  *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004).

The receivership order—and the two orders modifying it—all contain the same clear and unambiguous language.  The Court's authority is firmly behind Scouler as he carries out his responsibilities as receiver, and any person's "doing any act or thing whatsoever" to disrupt him from his duties is flatly prohibited by the receivership order.  Dkt. 7, ¶ 21; Dkt. 96, ¶ 21.

Despite the clarity of the that order in all its incarnations, Scouler has provided clear and convincing evidence that Hickok spurned the Court's order and authority.  The receiver provided his own affidavit detailing Hickok's refusal to allow him access to the PV system at

4

Gary's Garage, *see generally* Dkt. 124, as well as his attorney's affidavit narrating his efforts to contact Hickok, Dkt. 124-1, ¶¶ 1-6.

Hickok's disconnecting the PV system and preventing the receiver from using it to generate electricity has actively harmed the receivership both by denying it a source of revenue and by setting a bad example for the receivership's other lessors.  In the absence of Hickok's dispute of these facts or arguments to the contrary, the affidavits meet the standard of clear and convincing evidence that he has interfered with the receiver's discharge of his duties.

Finally, Hickok has not attempted at all to comply with the receivership order, despite a slow and measured escalation in the pressure he was put under to do so.  First, Scouler notified all lessors that he was taking control of the receivership, provided them with a copy of the Order Appointing Receiver, and informed them he needed access to the premises. Dkt. 124, ¶ 9.  Next, when Hickok disconnected the PV system, Monolith contacted Hickok's son, and explained to him the state of the receivership while offering to begin to pay rent. *Id.* ¶ 10.  That overture was rebuffed.  *Id.*  Then, the receivership's attorneys wrote an email to Hickok to stress the importance of complying with the receivership order.  Dkt. 124-1, ¶ 2, pp. 4-5.[1]  Hickok's response was silence.  *Id.* ¶ 2.

Nevertheless, before moving for an order to show cause, the receivership's attorneys wrote Hickok another letter, sent by both email and post, which the United States Postal Service confirmed Hickok received on May 13, 2020.  Dkt. 124-1, ¶ 3, pp. 7-11.  Once Scouler moved to hold Hickok in civil contempt, he also personally served that motion on an employee of Gary's Garage on Monday, June 15, 2020.  Dkt. 124-1, p. 15.

---

[1] Pagination corresponds with CM/ECF.

But even that was not Hickok's final opportunity to comply with the receivership order. Hickok was given until July 8, 2020 to show cause why he should not be held in civil contempt by this Court's June 17, 2020 Memorandum-Decision and Order.  Dkt. 129. Scouler personally served him with that order on June 23, 2020. Dkt. 137.  In other words, Hickok was warned that disrupting the receiver's discharge of his duties would violate an order of this Court on no fewer than six occasions, and still he has not provided so much of an explanation for his actions, let alone a reason not to hold him in contempt.  Thus, the Court is left with no choice but to hold Hickok in civil contempt of the receivership order.

That still leaves the question of how relief for his contempt must be framed.  Civil contempt fines come in two variants:  coercive or compensatory. *Paramedics*, 369 F.3d at 657.  Although the two categories are treated differently, a contempt sanction can simultaneously aim for both coercive and compensatory goals.  *Id.* at 658.  By necessary implication, however, there can be no punitive civil contempt fines.  *Id.* at 657.

If a fine is coercive, "the court has broad discretion" to design a remedy suitable to coerce compliance with its orders. *Paramedics*, 369 F.3d at 657 (cleaned up).  In wielding that discretion, however, the court must consider various factors, including "the character and magnitude of the harm threatened by continued contumacy," the probable effectiveness of the suggested sanction in bringing about compliance, and the contemnor's ability to pay. *Perfect Fit Indus. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir. 1982) (cleaned up).

If a fine is compensatory, and thus payable to an opposing party rather than the court, a court's discretion is more muted.  *See Terry*, 886 F.2d at 1353.  Specifically, the party seeking a compensatory fine must demonstrate proof of loss.  *Id.*  The sanction must then correspond "at least to some degree" with the amount of damages demonstrated. *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1062 (2d Cir. 1995).  Regardless of whether a sanction is

compensatory or coercive, a court may award appropriate attorneys' fees and costs to a victim of contempt. *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996).

If the contemnor can demonstrate that he is financially unable to comply with a civil contempt sanction, he may be excused from that sanction. *Paramedics*, 369 F.3d at 658. However, the contemnor bears the burden of proving his inability to pay. *United States v. Rylander*, 460 U.S. 752, 757 (1983).

Scouler has called for Hickok to be fined in the following amounts:  (1) the receiver's attorneys' fees incurred in securing the order to show cause; (2) $4,250 per month or $141.00 per day, the projected revenue Monolith estimates it has lost from the PV system at Gary's Garage not producing electricity; (3) any additional damages Hickok has caused to the PV system upon the receiver's application for additional damages; and (4) a daily coercive fine sufficient to compel Hickok's compliance.

First, it is appropriate to award Scouler attorney's fees and costs for the expenses he accrued in prosecuting this contempt action. *Weitzman*, 98 F.3d at 719.  The receiver may therefore make an itemized fee request with contemporaneous hourly records for the Court's review no later than Wednesday, August 5, 2020.  Hickok may oppose the motion for fees no later than Wednesday, August 19, 2020.

Second, upon review, Scouler has adequately demonstrated loss for being denied access to the Gary's Garage PV system.  The amount of $4,250 per month or $141 per day reflects only the lost profits from not being able to produce electricity using the Gary's Garage panel.  That amount was furthermore calculated based on Monolith's records and projections, which are as reliable a source as can be expected in calculating the counterfactual value of the PV system if it had been working as intended.  Lastly, that the receiver affirmed this amount to be accurate under penalty of perjury provides support for the validity of the fee

7

amount.  Accordingly, Scouler has adequately proven actual loss, and is entitled to a compensatory fine in the amount of $15,711, or $4,250 per month for April, May, and June, as well as $141 per day for July 1-21.

Third, Scouler may apply for any additional damages Hickok caused to the PV system by disconnecting it.  Should the receiver make such an application, the Court will conduct the same review again to determine the amount of actual loss caused by Hickok's contempt and will award the receiver a compensatory contempt fine if the receiver successfully proves loss.

Fourth and finally, a conditional daily fine is warranted to motivate Hickok to set aside his abiding failure to submit to the Court's authority.  If Hickok has not permitted Scouler to access the PV system by Friday, August 21, 2020, the Court will impose a $1,000 daily fine assessed beginning on that day and continuing every day until the receiver successfully accesses the PV system.  That daily fine, being coercive, will be owed to the Court, rather than to the receiver.

In any case, Hickok's refusal to allow Scouler to do his duty cannot continue.  It may seem unfair that Monolith may continue to profit from Hickok's property when it owes him substantial back rent for the use of that property, but ultimately all creditors of the receivership—including Hickok—would benefit most from allowing the receivership to do what it is designed to.  Namely, to maximize its profits and value so that some day Hickok and the other creditors can perhaps be paid what they are owed.  Regardless, until this case is resolved no creditor can take authority into his own hands that rightfully belongs to this Court.

Therefore, it is

ORDERED that

1.  Non-party Gary Hickok is held in civil contempt of this Court's Second Order Modifying the Receivership;

8

2.  Gary Hickok is ordered to pay Daniel Scouler a compensatory fine of $15,711 for profits lost by Gary Hickok's denying Daniel Scouler access to the PV system located at Gary's Garage, 8A Apollo Drive, Albany, New York 12205;

3.  Should Scouler not be permitted to access the PV system at Gary's Garage before August 21, 2020, the Court will assess a daily fine against Gary Hickok in the amount of $1,000 beginning that day and continuing until Scouler gains access;

4.  Upon Daniel Scouler's regaining access to the PV system at Gary's Garage, should Gary Hickok have damaged that system through his contempt of the Court's receivership order, Scouler may apply for an additional fine to recover for that damage;

5.  Daniel Scouler may apply for an award of attorneys' fees no later than Wednesday, August 5, 2020; which Gary Hickok may oppose no later than Wednesday, August 19, 2020; and

6.  Scouler is directed to personally serve this Memorandum-Decision and Order on Gary Hickok no later than Friday, July 31, 2020.

IT IS SO ORDERED.

Dated:  July 22, 2020
Utica, New York.

David N. Hurd
U.S. District Judge

9